IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02206-RM-KLM

CENTRAL TELEPHONE COMPANY OF VIRGINIA d/b/a CenturyLink, EMBARQ
FLORIDA, INC. d/b/a CenturyLink, EMBARQ MISSOURI, INC. d/b/a CenturyLink,
EMBARQ MINNESOTA, INC. d/b/a CenturyLink, UNITED TELEPHONE COMPANY OF
KANSAS d/b/a CenturyLink, UNITED TELEPHONE & TELEGRAPH COMPANY OF
INDIANA d/b/a CenturyLink, UNITED TELEPHONE COMPANY OF OHIO d/b/a
CenturyLink, UNITED TELEPHONE COMPANY OF THE NORTHWEST d/b/a CenturyLink,
and QWEST CORPORATION d/b/a CenturyLink QC,

       Plaintiffs and Counterclaim Defendants,

v.

AT&T CORP., NEW CINGULAR WIRELESS SERVICES, INC., AT&T MOBILITY, LLC,
NEW CINGULAR WIRELESS PCS, LLC, SBC LONG DISTANCE, LLC, and TELEPORT
COMMUNICATIONS GROUP, INC.,

       Defendants and Counterclaim Plaintiffs.

---

## AT&T'S MOTION FOR PRELIMINARY INJUNCTION

---

Paul R. Franke, III
Patrick J. Hickey
MOYE WHITE LLP
1400 16th Street, 6th Floor
Denver, CO 80202
Telephone: (303) 292-2900
Email: paul.franke@moyewhite.com
     patrick.hickey@moyewhite.com

Scott H. Angstreich
Thomas Schultz
Samuel Martin
Clayton J. Masterman
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Email: sangstreich@kellogghansen.com
     tschultz@kellogghansen.com
     smartin@kellogghansen.com
     cmasterman@kellogghansen.com

*Attorneys for Defendants and Counterclaim Plaintiffs*

October 19, 2022

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

BACKGROUND .................................................................................................... 3

    A.    AT&T and Lumen Enter into Three Concurrent Contracts in 2015 ...................... 3

    B.    Lumen's Breach of the Agreement and Collection Action ..................................... 4

    C.    Lumen Threatens To Disconnect More Than 20,000 Circuits Unless
    AT&T Pays in 60 Days the Same Amounts Lumen Seeks To Collect in
    Damages .................................................................................................................. 6

APPLICABLE LEGAL STANDARD ...................................................................... 7

ARGUMENT .......................................................................................................... 8

I.    The Court Should Resolve the Transfer Motion First and Issue Preliminary
Injunctive Relief So That the Southern District of New York Court Has
Sufficient Time To Rule on this Motion .............................................................. 8

II.    AT&T Will Suffer Irreparable Harm if Lumen Carries Out the Threatened
Disconnections ...................................................................................................... 9

III.    AT&T Is Likely To Prevail on the Merits of Lumen's Disconnection Threat ................. 11

    A.    Lumen's Threatened Disconnection Is an Improper Attempt To Moot
    Its Damages Action .............................................................................................. 11

    B.    AT&T Is Likely To Succeed on the Merits of the Underlying Billing
    Dispute ................................................................................................................. 12

IV.    The Public Interest and the Balance of the Equities Weigh in Favor of
Preliminary Injunctive Relief .............................................................................. 15

V.    The Court Should Not Require AT&T To Post a Bond ....................................... 17

CONCLUSION ...................................................................................................... 17

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49
    (2013) ......................................................................................................9

*Basank v. Decker*, 449 F. Supp. 3d 205 (S.D.N.Y. 2020) .............................................7

*Cont'l Oil Co. v. Frontier Refin. Co.*, 338 F.2d 780 (10th Cir. 1964) ..........................17

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) ........................................17

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256
    (10th Cir. 2004) ...................................................................................7, 10

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ............................................................16

*Framed Wall Art, LLC v. PME Holdings, LLC*, 2008 WL 5205822
    (D. Utah Dec. 12, 2008) ...........................................................................7

*Huber v. Granby Realty Holdings, LLC*, 2019 WL 2299799
    (D. Colo. May 30, 2019) .......................................................................8, 9

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24 (2d Cir. 1978) .................10

*Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021) ..........................................................11

*Martinez v. Cuomo*, 459 F. Supp. 3d 517 (S.D.N.Y. 2020) ................................... 16-17

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ...............................7

*N.Y. State Telecomms. Ass'n, Inc. v. James*, 544 F. Supp. 3d 269 (E.D.N.Y. 2021) ....................16

*Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assurance
    Co.*, 239 F. Supp. 3d 761 (S.D.N.Y. 2017) ................................................ 12-13

*Phlo Corp. v. Stevens*, 2001 WL 630491 (S.D.N.Y. June 7, 2001),
    *aff'd*, 62 F. App'x 377 (2d Cir. 2003) .....................................................11, 12

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016) ...........................7

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) .....................................10

*Reuters Ltd. v. UPI, Inc.*, 903 F.2d 904 (2d Cir. 1990) ................................................10

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) .........................................................17

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) ............................................................11

*Sw. Stainless, LP v. Sappington*, 582 F.3d 1176 (10th Cir. 2009) ..................................................10

*This Is Me, Inc. v. Taylor*, 157 F.3d 139 (2d Cir. 1998) .................................................................13

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ...................................................................................................10

*TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82 (2d Cir. 2005) ...........................................13

*United States v. TEG Rest. Grp. Inc.*, 2021 WL 1577711 (D. Colo. Apr. 22, 2021) ........................7

*Upsolve, Inc. v. James*, – F. Supp. 3d –, 2022 WL 1639554
    (S.D.N.Y. May 24, 2022) ..............................................................................................................7

*Williams v. Mobil Oil Corp.*, 445 N.Y.S.2d 172 (App. Div. 2d Dep't 1981) ................................12

*Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238
    (D. Colo. 2013) ...........................................................................................................................11

## STATUTES AND RULES

28 U.S.C. § 1404(a) .........................................................................................................................9

47 U.S.C. § 1421 *et seq.*..................................................................................................................6

Fed. R. Civ. P. 65(c) .......................................................................................................................17

## OTHER MATERIALS

Compl., *AT&T Corp. v. Cent. Tel. Co. of Va.*, No. 3:22-cv-05172 (W.D. La. filed
    Aug. 31, 2022) ..............................................................................................................................4

Report and Order, *Business Data Services in an Internet Protocol Environment*,
    32 FCC Rcd 3459 (2017)..............................................................................................................3

Lumen filed suit to resolve a billing dispute with AT&T over Lumen's charges for the communications services and circuits AT&T purchases to provide service to its own customers. Yet just months after filing suit, Lumen seeks to preempt the legal proceeding it started by issuing a disconnection notice to AT&T for more than 20,000 communications circuits unless AT&T pays in full — by December 5, 2022 — the same amounts Lumen seeks to collect in this lawsuit.

AT&T is entitled to preliminary injunctive relief enjoining Lumen from following through on that threat.  AT&T would suffer irreparable harm from the threatened disconnection, which would cause more than 1,400 wireline customers in 19 states to lose service and millions of wireless customers in those states to lose the ability to make and receive all calls.  The resulting losses of business reputation, goodwill, and future business opportunities are quintessential irreparable harm.  The disconnections would also cause substantial public harms, as AT&T's wireline customers include federal government agencies, state and local law enforcement, and hospitals, all of which would lose phone, data, and/or internet service.  And its wireless customers in those states, including first responders using their dedicated FirstNet service, would likely be unable to complete many phone calls, including to 911.  In contrast, Lumen will suffer no irreparable harm if it must wait to prevail on its collection action before being paid.

AT&T also is likely to succeed on the merits of its claims.  First, Lumen's threatened disconnection is improper until a court resolves its collection action.  Lumen has sued AT&T to collect the amounts AT&T has disputed and is withholding.  That precludes Lumen from engaging in self-help — and seeking to short-circuit the damages action it filed — by threatening

to disconnect the circuits with the billing disputes unless AT&T pays in full the same amounts that Lumen sued to recover.  Second, AT&T is also likely to prevail in the underlying billing dispute.  The parties dispute whether a contract giving discounts to AT&T remains in effect, but the plain language of that contract makes clear that it "run[s] concurrently" with another contract that Lumen *concedes* remains in effect.  Even if that contract expired, AT&T would still be entitled to discounted rates under the contract's post-termination provisions, which entitle AT&T to pay rates much lower than those Lumen seeks to collect through this lawsuit and its disconnection threat.

Although AT&T's entitlement to preliminary injunctive relief is clear, a Southern District of New York court should grant that relief.  As explained in AT&T's Motion to Transfer (ECF No. 34), the same contract that AT&T contends governs the rates Lumen may charge contains a forum-selection clause requiring all legal proceedings related to that contract to be filed in federal court (or, if federal jurisdiction is lacking, in state court) in the New York metropolitan area.  Although Lumen pleads that the contract expired, *see* Compl. ¶ 45 (ECF No. 1), AT&T disputes that allegation and argues that the contract continues to govern the rates Lumen may charge and AT&T must pay for the service at issue, *see* Countercls. ¶¶ 24-36 (ECF No. 33). This case therefore falls within the forum-selection clause and must be transferred to the Southern District of New York.

The Court should grant the Motion to Transfer and also grant preliminary injunctive relief to provide that court sufficient time to consider and rule on this motion.  In the alternative, the Court should grant this motion and preliminarily enjoin Lumen from terminating service to AT&T during the pendency of this case.

## BACKGROUND

### A.    AT&T and Lumen Enter into Three Concurrent Contracts in 2015

Three contracts govern different aspects of the relationship between AT&T and Lumen and establish terms on which AT&T and Lumen sell each other the communications circuits they use to transmit their customers' (governments, businesses, and individuals) phone calls and data and internet traffic.  In 2015, AT&T and Lumen entered a contract (the "Agreement") under which AT&T would buy services, then known as special access and now known as business data services, from Lumen at discounted rates.[1]  Business data services enable the "dedicated point-to-point transmission of data at certain guaranteed speeds and service levels using high-capacity connections" and are used to provide "voice, Internet, . . . and other digital services."[2]  They can connect AT&T's network to Lumen's network and also connect AT&T's network to an AT&T customer, through Lumen's network.  The contract had an initial term of three years, with automatic annual renewals subject to an initial termination date of March 31, 2022 that could be extended by agreement.  *See* Agreement §§ 4.1, 4.3.

Upon its termination, the Agreement provides AT&T with two options for continuing to purchase at discounted rates the business data services it had been purchasing under the Agreement.  First, with 90 days' notice to Lumen, AT&T could move those existing services to a "term discount plan" — that is, a plan that offers discounted rates in exchange for agreeing to

---

[1] The Agreement is subject to a nondisclosure agreement and contains a confidentiality provision, so it is not attached to this motion.  Lumen has consented to the disclosure of the provisions from the Agreement that are set forth in the Declaration of Carl Nickens attached to AT&T's Motion to Transfer (ECF No. 34-1).

[2] *E.g.*, Report and Order, *Business Data Services in an Internet Protocol Environment*, 32 FCC Rcd 3459, ¶ 6 (2017).

purchase services connecting designated locations for a specified period. *Id.* § 4.3. But in 2019, Lumen unilaterally eliminated its term discount plans for those services, depriving AT&T of the right to provide notice of a decision to elect term discount plan pricing upon the contract's termination. Second, AT&T is "entitled to purchase" those existing services "at rates, terms and conditions consistent with those rates, terms and conditions" that AT&T's affiliates "offer[] to [Lumen] for similar services." *Id.* In contrast to Lumen, AT&T's affiliates continued to offer term discount plans, which provide Lumen with lower rates for similar services.

The Agreement was one of three interconnected contracts that Lumen and AT&T entered in 2015. A second contract — the "Buy-side Agreement" — allowed Lumen to buy discounted business data services from AT&T. A third contract — the "ETTC Agreement" — was meant to provide AT&T with increased reliability when it purchased services from Lumen to connect AT&T's wireless cell sites in Lumen's territory to AT&T's network.[3] The Agreement refers to the three contracts as "Concurrent Agreements" and states that they are "meant to run concurrently." Agreement § 4.2.

**B.    Lumen's Breach of the Agreement and Collection Action**

In 2020, AT&T and Lumen amended the third contract (the ETTC Agreement) to extend its term by two years, to March 31, 2024. That amendment also had the effect of extending the term of the other two Concurrent Agreements, including the Agreement providing discounts to AT&T for business data services. Lumen, however, alleges that the Agreement expired on

---

[3] AT&T has filed a lawsuit for breach of that third contract — and of the underlying contracts it amended — in Louisiana, as the forum-selection clause in those contracts requires. *See* Compl., *AT&T Corp. v. Cent. Tel. Co. of Va.*, No. 3:22-cv-05172 (W.D. La. filed Aug. 31, 2022).

March 31, 2022.  *See* Compl. ¶ 45.  As of April 1, 2022, Lumen began invoicing AT&T for the same business data services AT&T had been purchasing under the Agreement at rates found in Lumen's Service Guides.  *See id.* ¶ 48.  Those rates are much higher than the discounted rates AT&T had been paying under the Agreement.

AT&T disputed those bills, paying a portion of the amount — based on the rates the Agreement had required Lumen to bill — and withholding the rest.[4]  AT&T also argued, in the alternative, that it was "entitled to purchase" those business data services at rates lower than those in the Service Guides that are "consistent with" the rates that AT&T's affiliates "offer[] to [Lumen] for similar services."  Agreement § 4.3.  Unlike Lumen, AT&T offered term discount plans for business data services.  And Lumen purchases business data services from AT&T's affiliates under those term discount plans.  As a result, Lumen pays lower rates to AT&T's affiliates than Lumen has billed AT&T for similar services since April 1, 2022.

In August 2022, Lumen filed this lawsuit, seeking to collect the amounts AT&T had disputed and withheld based on the Agreement.  Lumen filed in this Court, even though the Agreement contains the following mandatory forum-selection clause:

> Any legal proceeding arising out of, or relating to this Agreement, will be brought in a United States District Court, or absent federal court jurisdiction, in a state court of competent jurisdiction in the location New York, New York metropolitan area.

Agreement § 11.

---

[4] The Service Guides that Lumen cites in its complaint (¶¶ 2-3, 48) authorize customers, like AT&T, to "withhold[] the disputed amounts."  *E.g.*, Lumen Interstate Service Guide No. 9, § 2.4.1(B)(3)(c).

**C.      Lumen Threatens To Disconnect More Than 20,000 Circuits Unless AT&T Pays in 60 Days the Same Amounts Lumen Seeks To Collect in Damages**

In October 2022, about five weeks after filing this lawsuit, Lumen sent AT&T notices threatening to disconnect more than 20,000 circuits — including circuits serving government entities and carrying 911 calls, among others — unless AT&T pays in full, in 60 days, the same amounts Lumen seeks to collect through its complaint. *See* Declaration of Parley Casto ¶¶ 3-4, 7 ("Casto Decl."). AT&T uses these circuits to provide phone service, data service, internet service, or all three to more than 1,400 customers throughout 19 states. These customers include state and federal law enforcement agencies; emergency services; the military; hospitals; federal agencies; state and local government entities, including local law enforcement; and Fortune 500 companies. *See id.* ¶¶ 8-11. All of these customers will lose the service AT&T provides them if Lumen disconnects these circuits. *See id.* ¶ 15.

AT&T also uses these circuits in those states when its wireless customers, including first responders using FirstNet,[5] make calls to or receive calls from Lumen's end-user customers or end-user customers of other phone companies that connect indirectly to AT&T. *See id.* ¶¶ 5-6. Disconnection of the circuits will likely prevent these calls from completing, including when AT&T's wireless customers call 911. *See id.* ¶ 16.

AT&T cannot obtain alternative providers for these circuits within the 60 days Lumen provided. Indeed, for 94 percent of the circuits Lumen threatens to disconnect, Lumen is the only available provider for the services AT&T is purchasing. *See id.* ¶ 15. For the remaining

---

[5] FirstNet is a nationwide, dedicated wireless broadband communications platform network for first responders and public safety agencies, which was created pursuant to an Act of Congress. *See* 47 U.S.C. § 1421 *et seq.* In 2017, AT&T was selected as the FirstNet provider.

circuits, AT&T may be able to find an alternative provider, but the process of identifying the provider, negotiating a contract, and provisioning service cannot be completed in 60 days — assuming it can be completed at all.  *Id.*

## APPLICABLE LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013); *see also United States v. TEG Rest. Grp. Inc.*, 2021 WL 1577711, at *1 (D. Colo. Apr. 22, 2021) (Moore, J.) (same).[6] "The showing of irreparable harm is perhaps the single most important prerequisite for a preliminary injunction." *Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (same).

"Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief.  Rather, Plaintiffs must show a likelihood of success on the merits of at least one of their claims." *Upsolve, Inc. v. James*, – F. Supp. 3d –, 2022 WL 1639554, at *7 (S.D.N.Y. May 24, 2022); *Framed Wall Art, LLC v. PME Holdings, LLC*, 2008 WL 5205822, at *3 (D. Utah Dec. 12, 2008) (same); *see also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1253 (10th Cir. 2016) (remanding for the district court to grant a preliminary injunction when there was a likelihood of success on the merits on only one of two claims).

---

[6] AT&T cites both Tenth Circuit and Second Circuit law so that, if this Court grants the transfer motion to allow a Southern District of New York court to rule on the motion, that court can decide the motion on the existing briefing.

## ARGUMENT

AT&T is entitled to a preliminary injunction enjoining Lumen from disconnecting more than 20,000 communications circuits that currently allow more than 1,400 AT&T wireline customers to receive phone, data, and internet service and millions of AT&T wireless customers to make and answer all their phone calls. These disconnections would cause irreparable harm to AT&T by severely and permanently damaging the trust that AT&T's wireline and wireless customers place in AT&T to provide reliable phone, data, and internet service. AT&T is also likely to prevail on the merits of its argument that Lumen's threatened disconnection is improper, because (1) Lumen has already filed a collection action to recover amounts it contends are due, rendering its disconnection notices improper, and (2) in any event, Lumen has billed AT&T in breach of the Agreement, which continues to govern the rates Lumen may charge. A preliminary injunction would also prevent substantial harm to the public, as Lumen's disconnection would impair phone, data, and internet service to critical government agencies as well as hospitals and private business and likely prevent the completion of critical wireless calls, including calls to 911. In contrast, Lumen would not suffer any irreparable harm by waiting until it prevails in the lawsuit it filed to get paid the massively increased amounts it claims AT&T owes.

I.    **The Court Should Resolve the Transfer Motion First and Issue Preliminary Injunctive Relief So That the Southern District of New York Court Has Sufficient Time To Rule on this Motion**

As this Court has recognized, where it is presented with several motions including one that challenges the plaintiff's choice of forum, its "first priority is resolving whether this forum is proper." *Huber v. Granby Realty Holdings, LLC*, 2019 WL 2299799, at *4 (D. Colo. May 30, 2019). Upon deciding that another forum is proper because a forum-selection clause should be

enforced, "the Court does not decide the merits of the balance of [the] motion[s]." *Id.* at *8.[7]

Therefore, the Court should resolve AT&T's transfer motion first and, to enable that, should

order expedited briefing of that motion on the same schedule that it sets for the briefing of this

motion.  The Court should grant that motion for the reasons AT&T has set out.  However, given

the near-term threat of disconnection — and the irreparable harms disconnections would cause to

AT&T and the substantial harms it would impose on the public at large — the Court should also,

as an administrative matter, grant preliminary injunctive relief for the limited purpose of

permitting the Southern District of New York court sufficient time to rule on AT&T's

preliminary injunction motion.

## II.   AT&T Will Suffer Irreparable Harm if Lumen Carries Out the Threatened Disconnections

AT&T's customers trust AT&T to provide continuous, reliable phone, data, and internet

service.  *See* Casto Decl. ¶ 17.  AT&T has developed this trust over decades, and this trust is a

key part of why customers (including governmental entities providing critical functions) choose

AT&T over other telecommunications providers.  Lumen's disconnections will deprive AT&T's

customers of the reliable service that AT&T has consistently provided.  *See id.* ¶ 15.  More than

1,400 customers — including government entities, hospitals, airlines, utilities, and nationwide

private businesses — in 19 states will lose their service.  *See id.* ¶¶ 6-7.  And AT&T's wireless

customers in those states, including first responders using FirstNet, will likely be unable to make

---

[7] The forum-selection clause in *Huber* specified a state court, *see* 2019 WL 2299799, at *2, so the Court considered a motion to dismiss under the doctrine of *forum non conveniens*, *see id.* at *4 (citing *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013)).  But where, as here, the forum-selection clause specifies federal court, a motion to transfer under 28 U.S.C. § 1404(a) is proper.  *See Atl. Marine*, 571 U.S. at 52.

or receive all their telephone calls, including calls to 911.  *See id.* ¶ 16.  Such service outages and loss of reliability would severely and permanently damage the trust that AT&T's customers place in AT&T, costing AT&T its reputation and goodwill, as well as future business opportunities in the wireline and wireless marketplaces.  *See id.* ¶ 17.

Courts routinely grant preliminary injunctions to prevent similar irreparable harm.  For example, in *Reuters Ltd. v. UPI, Inc.*, 903 F.2d 904 (2d Cir. 1990), the Second Circuit explained that, where "customers expect and rely on the [provider] for a continuous supply of [a] product," termination "almost inevitably creates irreparable damage to the good will of the [provider]."  *Id.* at 907-08; *see also*, *e.g.*, *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 29 (2d Cir. 1978) (finding irreparable harm where movant "may incur injury to its goodwill and reputation as a dependable distributor"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (movant established irreparable harm based on "loss of reputation, good will, and business opportunities").  And in *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004), the Tenth Circuit explained that irreparable harm exists when a business faces "loss of goodwill or competitive market position."  *Id.* at 1264; *see also Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191-92 (10th Cir. 2009) (movant established irreparable harm based on the "incalculable damage to [customers'] goodwill"); *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (finding irreparable injury when the movant "has no protection against the loss of its business while the litigation progresses").

AT&T cannot mitigate these harms by turning to alternative providers for the circuits it currently purchases from Lumen.  Lumen is the sole provider for 94 percent of those circuits, and

while alternative providers may exist for the remainder, AT&T could not obtain replacements before the threatened termination date.  *See* Casto Decl. ¶ 15.

Absent a preliminary injunction, therefore, AT&T will suffer a devastating rupture of trust with its customers — a quintessential form of irreparable harm.

**III.    AT&T Is Likely To Prevail on the Merits of Lumen's Disconnection Threat**

**A.    Lumen's Threatened Disconnection Is an Improper Attempt To Moot Its Damages Action**

In August 2022, Lumen sued AT&T to collect the amounts AT&T disputed and withheld for the same circuits that Lumen now seeks to disconnect, unless AT&T pays Lumen in full.  But Lumen has not prevailed on its collection action — indeed, this case is just beginning.  Having submitted itself to the jurisdiction of a court to resolve the parties' billing dispute, it must wait for the court to validate its claims and cannot use the threat of disconnection to short-circuit the litigation it started.  Indeed, if AT&T were to pay the amounts Lumen demands, it would grant Lumen the ultimate relief it seeks and moot the damages claims Lumen filed.  A preliminary injunction is therefore appropriate "to preserve the relative positions of the parties until a trial on the merits can be held."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005); *see Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (same).

In addition, in a breach of contract dispute like this one, Lumen, as the allegedly "non-breaching party[,] may elect to continue to perform the contract or it may refuse to continue and terminate the agreement."  *Phlo Corp. v. Stevens*, 2001 WL 630491, at *4 (S.D.N.Y. June 7, 2001), *aff'd*, 62 F. App'x 377 (2d Cir. 2003); *see also Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA) Inc.*, 958 F. Supp. 2d 1238, 1244 (D. Colo 2013) ("[The non-breaching party] may, of course, terminate or seek rescission of the contract; alternatively, it may elect to affirm the

contract and continue both sides' performance obligations, seeking damages only for the past breach.").  Lumen selected the first option, alleging in its complaint that AT&T has "refus[ed] to pay Lumen for telecommunication services Lumen has provided *and continues to provide* to AT&T[.]"  Compl. ¶ 1 (emphasis added).  Lumen, therefore, may not now threaten "to terminate the contract, for such a claim would be inconsistent with the previously elected 'remedy.'"  *Phlo Corp.*, 2001 WL 630491, at *4.  AT&T is therefore likely to succeed on the merits of the question whether Lumen can terminate service to AT&T while Lumen's collection action remains unresolved.

**B.    AT&T Is Likely To Succeed on the Merits of the Underlying Billing Dispute**

AT&T is also likely to prevail on the merits of the underlying billing dispute.  AT&T is entitled to the discounted rates under the Agreement, which remains in effect because the parties extended that Agreement and the concurrent ETTC Agreement.  And even if Lumen were correct that the Agreement terminated, AT&T would still be entitled to discounted rates under the Agreement's post-termination provisions.

**1.**    The Agreement — and the discounted rates it grants AT&T — remains in effect because the parties agreed to extend the ETTC Agreement, which "run[s] concurrently" with the Agreement.  Agreement § 4.2.  The extension of the ETTC Agreement, therefore, extended the Agreement as well.  "[S]eparate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement."  *Williams v. Mobil Oil Corp.*, 445 N.Y.S.2d 172, 175 (App. Div. 2d Dep't 1981).[8]  Those separate agreements should be construed as one agreement where, as here, "the parties to the different contracts are the same";

---

[8] The parties agreed that New York law governs the Agreement.  *See* Agreement § 11.

"the contracts are mutually dependent"; "the agreements refer to each other"; and the agreements serve similar purposes. *Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assurance Co.*, 239 F. Supp. 3d 761, 785 (S.D.N.Y. 2017); *see also*, *e.g.*, *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 145 (2d Cir. 1998) (determining that separate contracts that "were executed more or less concurrently" and stated "that the two contracts were intended to be executed together" should be read as a single contract).

AT&T is likely to succeed on the merits of its claim that this is true of the three concurrent agreements AT&T and Lumen entered in 2015, such that the parties' extension of the ETTC Agreement also extended the Agreement. AT&T and Lumen entities are parties to all three contracts. Second, the contracts state they are "mutually dependent upon each other." Agreement § 1; ETTC Agreement at 3. Third, the contracts refer to each other. *See*, *e.g.*, Agreement § 4.2 ("[T]he Parties agree and understand that this Agreement along with the 2015 Ethernet to the Cell Services Agreement . . . [and] the 'Buy-side Agreement' . . . are meant to run concurrently."). Finally, the agreements serve a common purpose, which was to achieve rate parity between each parties' purchases of business data services from the other. The contracts make clear that the parties would not have entered any of the agreements without the other two. *Cf. TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 90 (2d Cir. 2005). Thus, when AT&T and Lumen agreed to extend one of the concurrent and mutually dependent agreements — the ETTC Agreement — through March 31, 2024, that had the effect of extending the Agreement as well.

      **2.**     Even if Lumen were correct that the Agreement terminated or expired on March 31, 2022, AT&T would still be likely to prevail on its alternative claim that it is entitled to

discounted rates under the Agreement's post-termination provision.  Section 4.3 of the Agreement grants AT&T two distinct rights upon the termination of the Agreement.  First, AT&T "may enroll" its existing circuits "in a term discount plan," by giving Lumen "notice . . . of its intent" to do so "at least 90 days in advance."  Agreement § 4.3.  Second, and alternatively, AT&T "is entitled to purchase" its existing circuits "at rates, terms and conditions consistent with those rates, terms and conditions" that AT&T's affiliates "offer[ ] to [Lumen] for similar services."  *Id.*  Furthermore, Lumen is required to "execut[e] any . . . requisite document necessary to effectuate the Parties['] agreement."  *Id.*

Section 4.3 thus gives AT&T two paths to continuing to obtain business data services at discounted rates from Lumen, rather than at the high month-to-month rates in Lumen's Service Guides.  Lumen, however, has breached the Agreement as to both paths, as well as its own duty to execute documents necessary to effectuate the Parties' agreement.  First, in 2019, Lumen unilaterally eliminated all its term discount plans for the services AT&T was buying from Lumen under the Agreement.  That action nullified AT&T's clear right to enroll its existing purchase in a term discount plan at the end of the Agreement.  Lumen's breach also made it impossible for AT&T to give 90 days' notice of an intent to enroll in plans, as they no longer existed.

Second, unlike Lumen, in April 2022, AT&T's affiliates were offering term discount plans.  And starting in that month, Lumen has purchased similar services under those plans, which afford Lumen much lower rates than it demands AT&T pay.  For example, at the month-to-month rates in Lumen's Interstate Service Guides, it would cost AT&T more than $12,000 per month to purchase a 15-mile, high-capacity, DS3 circuit to serve an end-user customer located in Denver.  *See* Countercls. ¶ 37.  Under AT&T's three-year term discount plan, Lumen would pay

far less each month to purchase the same 15-mile, high-capacity, DS3 circuit to serve an end-user customer in Atlanta (less than $3,200), Chicago (about $4,500) Dallas (less than $5,400), or Los Angeles (less than $3,750).  *See id.*  Under Section 4.3, AT&T has a clear "entitle[ment]" to purchase services from Lumen at rates "consistent with" those Lumen currently pays AT&T's affiliates, with no preconditions to the exercise of that entitlement.  *Id.* § 4.3.  Yet Lumen is demanding that AT&T pay Lumen at its much higher month-to-month Service Guide rates, even as it pays much lower rates to AT&T's affiliates for similar services.

For these reasons, AT&T is also likely to succeed on its claim that Lumen is not entitled to bill and collect the Service Guide rates that it claims AT&T must pay to prevent termination of service.

### IV.    The Public Interest and the Balance of the Equities Weigh in Favor of Preliminary Injunctive Relief

The remaining factors — the public interest and the balance of the equities — also support entry of a preliminary injunction.

First, Lumen's threatened disconnection would cause substantial harms to the public. More than 1,400 AT&T wireline customers in 19 states would lose service, including national security and federal law enforcement agencies, *see* Casto Decl. ¶¶ 6-8; federal economic regulators, *see id.*; numerous federal agencies responsible for a wide variety of government functions, *see id.*; state and tribal governments, *see id.* ¶ 9; state and local law enforcement, *see id.*; health care providers and hospitals, *see id.* ¶ 10; railways and airlines, *see id.*; energy utilities, *see id.*; and numerous national businesses, *see id.* ¶ 11.  Any of these customers losing phone, data, or internet service would cause substantial public harm.  All of them losing service

at the same time could be a catastrophe.  *See id.* ¶¶ 20-23.[9]  In addition, the likely inability of

AT&T's wireless customers, including first responders using FirstNet, to make 911 calls in the

states affected by the disconnection — or to complete all the calls to and from their phones —

would similarly harm the public.  *See id.* ¶¶ 24-25.  A preliminary injunction, therefore, would

clearly serve the public interest.  *Cf. N.Y. State Telecomms. Ass'n, Inc. v. James*, 544 F. Supp. 3d

269, 288 (E.D.N.Y. 2021) (finding public interest favored injunction when enjoined conduct may

"reduce Internet access statewide").

Second, the balance of harms also tips decidedly in AT&T's favor.  As shown above,

AT&T would suffer irreparable harm to its reputation, goodwill, and future business

opportunities from the disconnection of these circuits.  In contrast, Lumen would suffer no

irreparable harm if it must wait to prevail in its lawsuit — while being paid amounts based on the

parties' Agreement — before getting paid the huge additional amounts it claims are due, but that

AT&T disputes.[10]  *See, e.g., Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016) (determining

balance of hardships tipped in movant's favor when it would suffer irreparable harm and non-

movant would suffer "the administrative burdens of compliance"); *Martinez v. Cuomo*, 459

---

[9] While Lumen stated that it excluded circuits with Telecommunications Service Priority — a federal designation granting priority treatment for lines necessary to national security and other emergency response — Lumen's disconnection threat includes more than 1,200 such circuits.  *See* Casto Decl. ¶¶ 12-13.  And, as explained in the Casto Declaration, disconnection of any of the circuits would create serious risks to public health and safety.  *See id.* ¶¶ 20-25.

[10] In addition to those amounts, Lumen also seeks late payment charges under its Interstate Service Guides, *see* Compl. ¶ 57 & Prayer for Relief ¶¶ 1-2, which contain a rate of 0.000407 per day, compounded daily, or more than 16 percent annually, *see* Lumen Interstate Service Guide No. 9, § 2.4.1(B)(b)(II); Lumen Interstate Service Guide No. 11, § 2.4.1.B.2.c(2).

F. Supp. 3d 517, 526-27 (S.D.N.Y. 2020) (finding the balance of hardships favored movants when the injunction would not "impose an undue financial or administrative burden").

## V.      The Court Should Not Require AT&T To Post a Bond

Courts have "latitude . . . in making bond decisions" and determining the security, if any, that is "proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (quoting Fed. R. Civ. P. 65(c) and affirming the decision not to require a bond); *see also Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (same).  If a court holds that AT&T is required to pay amounts it has disputed and withheld, AT&T will be able to pay that judgment.  Lumen obtains no meaningful additional protection by requiring AT&T to post a bond.  *See*, *e.g.*, *Cont'l Oil Co. v. Frontier Refin. Co.*, 338 F.2d 780, 783 (10th Cir. 1964) (per curiam) (concluding that the district court did not abuse its discretion by not requiring bond where "[t]he evidence shows that Frontier is a corporation with considerable assets and that it is able to respond in damages if Continental does suffer damages by reason of the injunction").

## CONCLUSION

The Court should grant a limited preliminary injunction so that a court in the Southern District of New York will have sufficient time to resolve this motion before any disconnection occurs.  In the alternative, the Court should grant this motion and preliminarily enjoin Lumen from disconnecting any circuits during the pendency of this lawsuit.

Dated: October 19, 2022

Respectfully submitted,

/s/ *Scott H. Angstreich*

Paul R. Franke, III
Patrick J. Hickey
MOYE WHITE LLP
1400 16th Street, 6th Floor
Denver, CO 80202
Telephone: (303) 292-2900
Email: paul.franke@moyewhite.com
       patrick.hickey@moyewhite.com

Scott H. Angstreich
Thomas Schultz
Samuel Martin
Clayton J. Masterman
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Email: sangstreich@kellogghansen.com
       tschultz@kellogghansen.com
       smartin@kellogghansen.com
       cmasterman@kellogghansen.com

*Attorneys for Defendants and Counterclaim Plaintiffs AT&T Corp., New Cingular Wireless Services, Inc., AT&T Mobility, LLC, New Cingular Wireless PCS, LLC, SBC Long Distance, LLC, and Teleport Communications Group, Inc.*