IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02206-RM-KLM

BRIGHTSPEED OF VIRGINIA, LLC, CENTURYLINK OF FLORIDA, INC., BRIGHTSPEED OF WEST MISSOURI, INC., CENTURYLINK OF MINNESOTA, INC., BRIGHTSPEED OF KANSAS, INC., BRIGHTSPEED OF INDIANA, LLC, BRIGHTSPEED OF OHIO, UNITED TELEPHONE COMPANY OF THE NORTHWEST d/b/a CenturyLink, and QWEST CORPORATION d/b/a CenturyLink QC,

    Plaintiffs and Counterclaim Defendants,

v.

AT&T CORP., NEW CINGULAR WIRELESS SERVICES, INC., AT&T MOBILITY, LLC, NEW CINGULAR WIRELESS PCS, LLC, SBC LONG DISTANCE, LLC, and TELEPORT COMMUNICATIONS GROUP, INC.,

    Defendants and Counterclaim Plaintiffs.

## AT&T'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Paul R. Franke, III
Patrick J. Hickey
MOYE WHITE LLP
1400 16th Street, 6th Floor
Denver, CO 80202
Telephone: (303) 292-2900
Email: paul.franke@moyewhite.com
       patrick.hickey@moyewhite.com

Scott H. Angstreich
Thomas Schultz
Samuel Martin
Clayton J. Masterman
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Email: sangstreich@kellogghansen.com
      tschultz@kellogghansen.com
      smartin@kellogghansen.com
      cmasterman@kellogghansen.com

*Attorneys for Defendants and Counterclaim Plaintiffs*

November 10, 2022

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I.    AT&T Seeks a Prohibitory, Not a Mandatory, Injunction .................................................. 2

II.    AT&T Will Be Irreparably Harmed Absent a Preliminary Injunction ............................... 3

III.    AT&T Is Likely To Prevail on the Merits ............................................................................ 6

        A.    Lumen Elected To Adjudicate This Dispute and Cannot Now Threaten Disconnection if AT&T Does Not Give in to Lumen's Demands .......................... 6

        B.    AT&T Is Likely To Prevail on the Merits of the Underlying Payment Dispute ................................................................................................................. 8

IV.    The Public Interest and the Balance of Equities Favor an Injunction .............................. 12

V.    The Court Should Not Require AT&T To Post a Bond ..................................................... 13

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

Page

**CASES**

*Cont'l Oil Co. v. Frontier Refin. Co.*, 338 F.2d 780 (10th Cir. 1964) ............................................ 14

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) ............................................................ 14

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ............................................................................ 1, 4

*Kane v. De Blasio*, 19 F.4th 152 (2d Cir. 2021) ................................................................................ 2

*Lawrence & Mem'l Hosp. v. Sebelius*, 986 F. Supp. 2d 124 (D. Conn. 2013) ................................ 5

*Lawyers' Fund for Client Prot. of N.Y. v. Bank Leumi Tr. Co. of N.Y.*,
    727 N.E.2d 563 (N.Y. 2000) ........................................................................................ 10

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*:

    296 F. Supp. 3d 442 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018) ........................... 5

    883 F.3d 32 (2d Cir. 2018) ............................................................................................. 2

*Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553 (2d Cir. 2011) ...................................................... 14

*Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997) .......................... 3

*Phlo Corp. v. Stevens*, 2001 WL 630491 (S.D.N.Y. June 7, 2001),
    *aff'd*, 62 F. App'x 377 (2d Cir. 2003) ............................................................................. 7

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ....................................................... 14

*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096 (10th Cir. 1991),
    *overruled on other grounds by O Centro Espirita Beneficiente*
    *Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) ................................... 2, 3

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) ..................................................... 2, 5, 6

*Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town*
    *of Fairfield*, 790 F. Supp. 1197 (D. Conn. 1992) ....................................................... 4-5

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 2011 WL 2473330
    (C.D. Ill. June 22, 2011), *aff'd*, 695 F.3d 676 (7th Cir. 2012) ....................................... 4

*Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop. Corp.*,
     2015 WL 1280818 (W.D. Ky. Mar. 20, 2015) ................................................................5, 7

*Upsolve, Inc. v. James*, – F. Supp. 3d –, 2022 WL 1639554
     (S.D.N.Y. May 24, 2022)................................................................................................8

*Video-Cinema Films, Inc. v. Seaboard Sur. Co.*, 625 N.Y.S.2d 195
     (App. Div. 1st Dep't 1995) .............................................................................................9

*Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA) Inc.*,
     958 F. Supp. 2d 1238 (D. Colo. 2013)............................................................................7


**RULES**

Fed. R. Civ. P. 65(c) ..................................................................................................................14

Lumen wants to circumvent the adjudication of the claims in its own complaint by threatening to disconnect thousands of circuits that AT&T uses to provide service to its wireline and wireless customers unless AT&T gives in to Lumen's payment demands. Lumen's threatened disconnection would cause catastrophic harm to AT&T and its affected customers. Lumen does not dispute this. Lumen instead asserts that this harm would be "self-inflicted" because AT&T could avoid it by paying Lumen. But the Tenth Circuit has "reject[ed] the notion that the source of an injury [for purposes of a preliminary injunction] is a litigant's decision not to comply with an allegedly unlawful [demand], rather than the [demand] itself." *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016). Moreover, Lumen admits that, even if AT&T pays the amounts Lumen demands now, Lumen will threaten disconnection again unless AT&T keeps paying Lumen at the rates it demands while this case proceeds. AT&T would be irreparably harmed by this massive out-of-pocket cost. Yet Lumen identifies no harm it would incur without the windfall it seeks from rates that — after its recent 20 percent price increase — are about *five times* higher than those Lumen agreed to receive in March 2022. Until a court resolves Lumen's claim that it may bill those inflated rates without breaching the Agreement, Lumen should not be allowed to disconnect the circuits and irreparably harm AT&T, its customers, and the public.

The Court should decide AT&T's transfer motion before ruling on this motion. *See* Mot. at 8-9. Lumen does not contest this. But if the Court grants the transfer motion, it need not grant interim injunctive relief because Lumen has agreed not to disconnect any circuits until either this Court or a court in the Southern District of New York rules on this motion.[1]

---

[1] *See* Unopposed Mot. To Expedite Briefing at 3 (ECF No. 39) ("Lumen's counsel has informed AT&T's counsel that Lumen will not disconnect circuits until this Court and/or the

I.      **AT&T Seeks a Prohibitory, Not a Mandatory, Injunction**

AT&T seeks a preliminary injunction "enjoining Lumen from following through on [its] threat" to disconnect thousands of communication circuits that AT&T uses to provide service to customers. Mot. at 1. Lumen has allowed AT&T to use these circuits for years, and (until recently) has charged AT&T consistent rates for these circuits. AT&T's requested injunction would therefore "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005); *see Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam) (same).

Lumen seeks (at 8) to recharacterize AT&T's request to preserve the status quo as a disfavored "mandatory" injunction. But a mandatory injunction "disrupt[s] the status quo." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (holding that NASL's request to "alter [a] near-decade-long relationship" sought a "mandatory injunction"); *see SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991) (same, and holding that a preliminary injunction "requir[ing] Visa to approve [plaintiff's] card order . . . would clearly have altered the status quo"), *overruled on other grounds by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (en banc) (per curiam). The relevant status quo is "the last uncontested status between the parties which preceded the controversy." *Schrier*, 427 F.3d at 1260. Here, the "last uncontested status" is that Lumen provided TDM services to AT&T, and AT&T continues to pay the rates Lumen historically charged for those services. AT&T seeks to preserve, not disrupt, that status quo.

---

Southern District of New York court has ruled on the pending motions."). Lumen's counsel reviewed and approved this language before AT&T filed the unopposed motion.

The sole case Lumen cites is not to the contrary. In *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14 (4th Cir. 1997), TWA had already "terminated its agency relationship with Omega" by the time the case was before the appellate court. *Id.* at 15. That is not the case here, where AT&T seeks to preserve *existing* services — not force Lumen to reconnect services that had already been disconnected. Nor would requiring Lumen to maintain the status quo — providing service to AT&T at the same prices AT&T paid for years — "place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction." *SCFC*, 936 F.2d at 1099. No "ongoing supervision" would be necessary: as long as Lumen does *not* take the affirmative step of disconnecting the circuits, no court will need to actively police the preliminary injunction.

## II. AT&T Will Be Irreparably Harmed Absent a Preliminary Injunction

If Lumen follows through on its threat to disconnect the circuits at issue, AT&T will face devastating and irreparable harm to its goodwill and lose future business opportunities. *See* Mot. at 9-11; Casto Decl. ¶¶ 6-7, 15-17.[2] Lumen does not dispute this. Instead, Lumen asserts (at 19-21) that this irreparable harm is "self-inflicted" because AT&T can avoid this harm by paying Lumen the full amount it demands.[3] That is not the law.

---

[2] The total number of circuits facing a threat of disconnection is now approximately 18,700. *See* Reply Declaration of Parley Casto ¶ 5 ("Casto Reply Decl."). Lumen has agreed not to disconnect 1,281 additional circuits because they have Telecommunications Service Priority status in AT&T's system. *See* Widdoes Decl. Ex. 7. And, in September and October, additional circuits were disconnected through ordinary business operations and customer decisions. *See* Casto Reply Decl. ¶ 5.

[3] Lumen (at 19) purports to provide "three reasons" that AT&T will not suffer irreparable harm, but each boils down to the same argument: that, if AT&T pays Lumen the currently withheld amounts and continues to pay Lumen in full while this case is pending, Lumen will not disconnect circuits.

3

AT&T is not required to avoid otherwise irreparable harm by acceding to Lumen's wrongful demands for payments. The Tenth Circuit has "reject[ed] the notion that the source of an injury [for purposes of a preliminary injunction] is a litigant's decision not to comply with an allegedly unlawful [demand], rather than the [demand] itself." *Fish*, 840 F.3d at 754. In *Fish*, plaintiffs sought a preliminary injunction against the enforcement of a state law that the plaintiffs alleged was preempted by a federal statute. Defendants argued that the plaintiffs' harm was "self-inflicted because they could have complied with the [statute] but simply chose not to do so." *Id.* at 753. The Tenth Circuit rejected this argument as "absurd," explaining that, if defendants were correct, "a court could never enjoin enforcement of an unlawful statute if the plaintiffs could have complied with the statute but elected not to." *Id.* at 754.

Although *Fish* involved a statute, courts apply this same principle when a private party threatens to inflict irreparable harm unless another party complies with its demands. In *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, for example, a fast-food franchisee sought a preliminary injunction preventing the franchisor from terminating the relationship while their contract dispute was pending. The court rejected the argument that "any harm from the loss of the franchise would be self-inflicted," explaining:

> The parties dispute whether Plaintiff must follow the Policy under the terms of the Agreements. Defendants have threatened to terminate the Agreements if Plaintiff does not follow the Policy. . . . Plaintiff contends that Defendants are violating the Agreements by trying to force Plaintiff to implement the Policy. If Plaintiff is correct, and Defendants are violating the Agreements, termination of the Agreements is not a self-inflicted injury. The harm to Plaintiff would, therefore, arise out of Defendants' alleged violation of the Agreements and is not self-inflicted.

2011 WL 2473330, at *10 (C.D. Ill. June 22, 2011), *aff'd*, 695 F.3d 676 (7th Cir. 2012). Other courts are in accord. *See, e.g., Stewart B. McKinney Found., Inc. v. Town Plan & Zoning*

4

*Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1209 (D. Conn. 1992) ("[P]laintiff does not have to acquiesce in a violation of its rights to avoid a claim of self-infliction of injury."); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 458 n.22 (E.D.N.Y. 2017) ("[T]o the extent that [a policy] were applied in a discriminatory manner, any harm arising from the [application of that policy] would not be considered 'self-inflicted.'"), *aff'd*, 883 F.3d 32 (2d Cir. 2018); *Lawrence & Mem'l Hosp. v. Sebelius*, 986 F. Supp. 2d 124, 133, 134 (D. Conn. 2013) (rejecting argument that plaintiff's harm was "self-inflicted and easily avoidable," because "absent a preliminary injunction, Plaintiff would be forced to choose between losses").

The same principle applies here: AT&T alleges that Lumen's inflated payment demands breach the parties' Agreement. In the interim, AT&T should not be forced to comply with Lumen's unlawful demands to avoid the catastrophic harm that Lumen's threatened disconnections would cause. Such a rule would encourage extortionate behavior and would frustrate the purpose of a preliminary injunction, which is "to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier*, 427 F.3d at 1258.[4]

Moreover, between the time Lumen filed this complaint and when it sent AT&T the disconnect notice, Lumen imposed an additional 20 percent, across-the-board price increase on

---

[4] Lumen's sole contrary authority, an unpublished, out-of-circuit district court decision, is inapposite. In that case, "[t]he narrow issue . . . [was] whether [the defendant] gave [the plaintiff] proper notice" before seeking to terminate service over a dispute totaling roughly $150,000. *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop. Corp.*, 2015 WL 1280818, at *3 (W.D. Ky. Mar. 20, 2015). The court held that the plaintiff was not likely to succeed on the merits of this issue and, even if it did, "[a]t best, [the plaintiff's] interpretation would provide [it] with another thirty days." *Id.* The court then observed that the plaintiff could avoid any irreparable harm by paying its overdue balance of $150,000. *Id.* at *4. These facts are starkly different from those here: Lumen seeks to require AT&T to pay more than $100 million immediately and more than $20 million *monthly* to avoid disconnection. *See* Opp. 23-24.

5

its Service Guide rates for the circuits AT&T is buying from Lumen.  *See* Casto Reply Decl. ¶ 18.  That recent increase, together with other Lumen rate increases, make the rates Lumen is demanding AT&T pay today about *five times* higher than the rates Lumen admits it agreed to receive as recently as March 2022.  *See id.* ¶ 19.  Yet the circuits AT&T is buying from Lumen are unchanged, and AT&T continues to pay Lumen as it has before.  The significant additional out-of-pocket costs Lumen seeks to impose on AT&T before a court rules on Lumen's entitlement to that money would irreparably harm AT&T, which would likely have to cease or delay important investments and suffer a resulting loss of good will and business opportunities. *See id.* ¶¶ 12-13.

Lumen says that "[i]f AT&T pays its past-due balance," it "will not disconnect th[e] circuits" so long as AT&T "continues to pay the invoiced amounts for those circuits going forward."  Widdoes Decl. ¶ 21.  Yet Lumen does not rule out further, unilateral increases to its Service Guide rates while this case is pending.  AT&T should not be made to bear the burden of this uncertainty and caprice on pain of disconnection while the parties adjudicate their dispute.  This is the function of a preliminary injunction:  "to preserve the relative positions of the parties until a trial on the merits can be held."  *Schrier*, 427 F.3d at 1258.  That interim relief is appropriate here to prevent irreparable harm to AT&T.

**III.     AT&T Is Likely To Prevail on the Merits**

    **A.     Lumen Elected To Adjudicate This Dispute and Cannot Now Threaten Disconnection if AT&T Does Not Give in to Lumen's Demands**

Lumen asked this Court to adjudicate its entitlement to relief.  It now seeks to reverse course and moot its own claim for damages by using the threat of disconnection to garner that same relief.  In addition to improperly mooting its own claims, such a course is "inconsistent

6

with [Lumen's] previously elected 'remedy'" of a claim for damages. *Phlo Corp. v. Stevens*, 2001 WL 630491, at *4 (S.D.N.Y. June 7, 2001), *aff'd*, 62 F. App'x 377 (2d Cir. 2003); *see also Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA) Inc.*, 958 F. Supp. 2d 1238, 1244 (D. Colo. 2013) (similar). For these reasons alone, AT&T is likely to succeed on the merits of the question whether Lumen can terminate service to AT&T while Lumen's collection action remains unresolved. Lumen's responses lack merit.

First, Lumen asserts (at 9-10) that its disconnection threat would not moot its complaint because it would have damages claims for circuits that it is *not* currently threatening to disconnect. That misses the point. This motion for preliminary injunction concerns the circuits Lumen *is* threatening to disconnect. With respect to those circuits, Lumen's disconnection threat is an attempt to grant itself the full monetary relief it is seeking in this case and moot its claims.

Second, Lumen again relies (at 10) on *Time Warner*. But there, the company seeking to disconnect service had not previously filed suit to collect the amounts allegedly due. *See* 2015 WL 1280818, at *1. Instead, unlike Lumen, that company elected disconnection as its remedy.

Third, Lumen asserts (at 10-11) that filing its complaint was not an election of remedies with respect to AT&T's *future* alleged breaches — by which it means AT&T's continued withholding on the same grounds that formed the basis for the lawsuit. Not so: Lumen's complaint seeks damages for past invoices and a declaratory judgment that AT&T must pay

7

Lumen at the rates Lumen demands in the future. *See* Compl. ¶¶ 51-58. Lumen has accordingly elected its remedy with respect to both the past and future alleged breaches at issue here.[5]

### B.     AT&T Is Likely To Prevail on the Merits of the Underlying Payment Dispute

AT&T is also likely to prevail on the merits of the underlying payment dispute.[6]

**1.**     The unambiguous language of Section 4.2 of the Agreement makes clear that it "run[s] concurrently" with the ETTC Agreement, which remains in effect today. The two contracts also state that they are "mutually dependent upon each other." Agreement § 1; ETTC Agreement at 3; *see* Mot. at 13. Lumen does not address this clear language. Instead, Lumen points to other contract provisions that do not modify or supersede the Agreement's unambiguous "run concurrently" language.[7]

First, Lumen notes (at 12) that the Agreement and the ETTC Agreement have different initial terms. Lumen ignores the language in Section 4.2 that immediately follows the Agreement's default three-year term (in Section 4.1): "*[n]otwithstanding*, the Parties agree and understand that this Agreement along with the [Ethernet and Buy-Side Agreements] *are meant to run concurrently*." Agreement § 4.2 (emphases added). The parties thus agreed that the two contracts would "run concurrently," "notwithstanding" the Agreement's default three-year term.

---

[5] Contrary to Lumen's claims (at 11), neither *Apex Pool* nor *ESPN* involved a party that (like Lumen) affirmatively sought a declaratory judgment regarding future alleged breaches by the other party (thereby electing its remedy).

[6] As AT&T explained, it need only show a likelihood of success on at least one claim. *See* Mot. at 7 (citing *Upsolve, Inc. v. James*, – F. Supp. 3d –, 2022 WL 1639554, at *7 (S.D.N.Y. May 24, 2022)). Lumen does not dispute this.

[7] Instead of addressing the clear contract language AT&T cited, Lumen (at 12) addresses language explaining that the contracts were "execute[d] . . . contemporaneously." That language lends further support to AT&T's interpretation: contracts that "are meant to *run* concurrently" — that is, to remain in force at the same time — will also start at the same time.

Second, Lumen's reliance (at 12) on Sections 4.2.1 and 4.2.2 of the Agreement is equally misplaced. Those sections state that, if the third contract between the parties (the Buy-Side Agreement) fails to become effective or is terminated because of "FCC actions," the parties will attempt in good faith to negotiate a new agreement for Lumen to purchase TDM service from AT&T (and if the parties are unsuccessful, Lumen can terminate the Agreement, under which it sold TDM service to AT&T). Far from supporting Lumen's position, these provisions reinforce the parties' intent that the three contracts at issue are "mutually dependent."

Third, Lumen points (at 13) to Section 4.5. But that section also supports AT&T's position. Section 4.5 states that, if AT&T terminates either of the other two contracts "other than for Cause," the Agreement terminates as well. Agreement § 4.5. But if *Lumen* materially breaches one of the other two contracts — and so AT&T terminates that other contract "for Cause" — AT&T does not automatically lose the benefits the Agreement provides. *Id.* There is nothing inconsistent between the intent that all three agreements remain in effect concurrently while the parties comply with all of them, and providing AT&T protection against losing the Agreement's benefits because Lumen materially breached one or both of the others.

Lumen's appeal to parol evidence (at 14-15) is also unpersuasive. As an initial matter, the contracts are unambiguous: they are "mutually dependent" and intended to "run concurrently." Resort to parol evidence is unnecessary and impermissible. *See Video-Cinema Films, Inc. v. Seaboard Sur. Co.*, 625 N.Y.S.2d 195, 196 (App. Div. 1st Dep't 1995) (contract language that "is clear and unambiguous . . . may not be varied or contradicted by parol evidence"). In any event, the parol evidence is consistent with AT&T's position (and the clear language of the contracts). For example, while Lumen notes (at 14) that AT&T

9

attempted to extend the Agreement after the parties extended the ETTC Agreement, it ignores that, in these negotiations, AT&T sought to extend the term of the Agreement *beyond* the already extended term, as part of omnibus negotiations with Lumen over a wide range of business dealings. *See* Casto Reply Decl. ¶ 24. These negotiations are consistent with AT&T's position here.[8]

2. Even if Lumen were correct that the Agreement terminated, AT&T is likely to prevail on its alternative claim that it is entitled to post-termination rates that are much lower than the inflated rates Lumen is demanding. Section 4.3 of the Agreement grants AT&T two distinct post-termination rights. First, AT&T "*may* enroll" its existing circuits "in a term discount plan" by providing notice to Lumen. Agreement § 4.3 (emphasis added). Second, AT&T "*is entitled* to purchase" its existing circuits "at rates, terms and conditions consistent with those rates, terms and conditions" that AT&T's affiliates "offer[ ] to [Lumen] for similar services," even if AT&T does not enroll in a term discount plan. *Id.* (emphasis added).

Lumen (at 16) incorrectly reads Section 4.3 to afford AT&T only a "single" post-termination option: enroll in a term discount plan by providing 90 days' notice. Lumen's interpretation makes the third sentence of Section 4.3 superfluous, which is "unsupportable under standard principles of contract interpretation." *Lawyers' Fund for Client Prot. of N.Y. v. Bank Leumi Tr. Co. of N.Y.*, 727 N.E.2d 563, 566-67 (N.Y. 2000). The third sentence gives AT&T a

---

[8] Lumen also notes (at 15) that AT&T's affiliated incumbent local telephone companies are billing Lumen at rates higher than those in the Buy-Side Agreement. Once Lumen told AT&T it would start billing and demanding payment at its much higher Service Guide rates, AT&T's affiliates were not required to unilaterally accept lower payments while Lumen demanded more. If AT&T prevails on its argument that the Agreement remains in effect, its affiliates will provide Lumen with any necessary bill credits. *See* Casto Reply Decl. ¶ 27.

present entitlement — not an option — to rates, terms, and conditions from Lumen that are consistent with those AT&T's affiliates offer to Lumen, rather than whatever term discount plans Lumen chooses to make available.  Lumen's assertion that AT&T's only post-termination option was to "enroll . . . in a term discount plan" that Lumen offers renders the third sentence meaningless.  And Lumen's effort (at 17) to square this circle — that AT&T "could request" that Lumen create a new term discount plan — is inconsistent with the Agreement's clear statement that AT&T "*is* entitled" to parity rates, terms, and conditions, as well as Lumen's obligation (which it ignores) to "execut[e] any other requisite document necessary to effectuate the Parties['] agreement."

       Lumen also misreads (at 16) the fourth sentence of Section 4.3.  That sentence has two parts — the first addresses the "conver[sion]" of existing services to "the elected term discount plan," while the second (as noted above) obligates Lumen, "in addition," to "execut[e] any other requisite document necessary to effectuate the Parties['] agreement."  Agreement § 4.3.  The two parts of this sentence thus support AT&T's reading of Section 4.3 as affording AT&T two discrete post-termination options.  In all events, when AT&T attempted to negotiate new TDM rates with Lumen, Lumen flatly refused to do so.  *See* Casto Reply Decl. ¶ 25.

       And while Lumen suggests (at 17-18) that AT&T is receiving rates that are "comparable" (but not equal) to the rates AT&T's affiliates give Lumen, it offers apples-to-oranges comparisons.  All of Lumen's comparisons are based on rates from August 2022, rather than the rates that AT&T's affiliates "offered to [Lumen] for similar services" in April 2022.  Agreement

11

§ 4.3; *see* Montenegro Decl. ¶¶ 10-24.[9]  On an apples-to-apples basis, in April 2022, Lumen was charging AT&T, on average, between 2.2 and 3.2 times as much for DS1 and DS3 circuits than AT&T's incumbent local telephone company affiliates were charging Lumen.  *See* Casto Reply Decl. ¶¶ 16-17.  And while Lumen is correct (at 18-19) that the rates Lumen must charge under the Agreement are lower than the consistent rates to which Section 4.3 entitles AT&T post-termination, both are many millions of dollars per month lower than the inflated rates Lumen is demanding AT&T pay or face circuit termination.  *See* Casto Reply Decl. ¶ 20.

**IV.    The Public Interest and the Balance of Equities Favor an Injunction**

**A.**    The public interest supports a preliminary injunction.  Disconnecting service for any of the wireline customers serviced by the circuits at issue would cause serious public harm.[10]  Without service, these customers — many of which are important government agencies and businesses — would be unable to use phone, internet, and/or data services, including to dial 911.  In addition, the disconnections would disrupt service to AT&T's wireless customers in 19 states, including first responders using FirstNet, preventing them from making and receiving all their wireless calls, including calls to 911.  *See* Mot. at 15-16; Casto Decl. ¶¶ 6-11, 20-25.

---

[9] Those comparisons, however, make clear that AT&T's affiliates' one-year term discount plan offers substantially greater discounts than the 17 percent discount in Lumen's Interstate Service Guide No. 11.  *See*, *e.g.*, Montenegro Decl. ¶ 10 (calculating a 48 percent discount under the AT&T affiliate plan).  The fact that term discount plans include early termination liability, *see id.* ¶¶ 15-24, is also standard in the industry.  AT&T would have faced similar liability under the "consistent" "rates, terms and conditions" that Section 4.3 "entitle[s]" AT&T to receive from Lumen.  *See* Casto Reply Decl. ¶ 21.

[10] The 1,281 circuits that Lumen has agreed not to disconnect because they have Telecommunications Service Priority reduces the number of affected customers.  *See* Casto Reply Decl. ¶ 5.  It does not reduce the effects on AT&T's wireless customers, including first responders that rely on FirstNet.  *See id.*

Lumen says nothing about the harms to wireless customers, including to the first responders using the unique First Net network. And it ignores that Telecommunications Service Priority is a voluntary program. The customers AT&T identified that would lose service if Lumen disconnects these circuits have not all signed up for that program. *See id.* ¶ 21. But many provide critical public services, *see id.* ¶¶ 6-11, that Lumen's disconnection would disrupt. Lumen's blithe suggestion (at 21-22) that these customers can easily switch to alternative suppliers ignores that these customers purchase services using lengthy competitive bidding processes (often legally mandated) and are currently purchasing legacy TDM services — not the broadband services to which Lumen points as alternatives — and so likely would also need to purchase new equipment to make use of the different technology. *See* Casto Reply Decl. ¶ 9.

**B.**     The balance of equities also supports a preliminary injunction. Lumen asserts (at 22-23) that continuing to receive payment at the Agreement's rates — rather than at the much higher Service Guide rates — would cause it harm. But Lumen does not support that assertion with a declaration (despite filing three of them). In contrast, AT&T has identified irreparable harms from the lost business opportunities and goodwill that would result if it had to pay Lumen's Service Guide rates, rather than those the Agreement guarantees to AT&T, even if it ultimately prevails and Lumen must refund those payments. *See* Casto Reply Decl. ¶¶ 12-13.

**V.     The Court Should Not Require AT&T To Post a Bond**

Rule 65(c) gives the Court discretion to determine the amount of a bond required for a preliminary injunction, including to determine that no bond is necessary. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (affirming decision not to require any bond); *see also Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (same). As AT&T

13

explained (at 17), where the movant "is a corporation with considerable assets and . . . is able to respond in damages if [the non-movant] does suffer damages by reason of the injunction," it is appropriate not to require any bond. *Cont'l Oil Co. v. Frontier Refin. Co.*, 338 F.2d 780, 783 (10th Cir. 1964) (per curiam). Lumen does not address these cases. AT&T is a Fortune 50 company with publicly available financials. Lumen makes no claim that AT&T lacks "considerable assets" or would be otherwise unable "to respond in damages" if Lumen prevails in this case.

If the Court concludes that some bond is appropriate, it should set the amount much lower than the $500 million Lumen demands. In arguing for so high a bond, Lumen references (at 23-24) amounts AT&T has already withheld. But a preliminary injunction bond protects against only those harms that the enjoined party could suffer *after* the preliminary injunction issues. *See Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 559 (2d Cir. 2011) (holding that a wrongfully enjoined party may recover "damages . . . proximately caused by the wrongful injunction"). Nor should the Court set a bond at this time based on a two-year time horizon. Lumen recognizes that AT&T's customers are disconnecting TDM circuits in favor of newer technologies. *See* Swindall Decl. ¶ 5. That trend is likely to accelerate. *See* Casto Reply Decl. ¶ 11. At most, the security the Court requires AT&T to provide should protect Lumen, in the event the Court later holds that Lumen was wrongfully enjoined, against the "approximately $20 million per month" that it claims (at 24) AT&T will withhold over the next 12 months, or $240 million. Lumen may seek to increase the bond amount after that time, if needed, based on more current information.

## CONCLUSION

For the reasons in AT&T's transfer motion, this Court should transfer this case to the Southern District of New York, so that court can decide this motion. That court — or this Court if it denies the transfer motion — should preliminarily enjoin Lumen from disconnecting any circuits during the pendency of this lawsuit.

Dated: November 10, 2022                                   Respectfully submitted,

                                                           /s/ *Scott H. Angstreich*
Paul R. Franke, III                                        Scott H. Angstreich
Patrick J. Hickey                                          Thomas Schultz
MOYE WHITE LLP                                             Samuel Martin
1400 16th Street, 6th Floor                                Clayton J. Masterman
Denver, CO 80202                                           KELLOGG, HANSEN, TODD,
Telephone: (303) 292-2900                                    FIGEL & FREDERICK, P.L.L.C.
Email: paul.franke@moyewhite.com                           1615 M Street, N.W., Suite 400
       patrick.hickey@moyewhite.com                        Washington, D.C. 20036
                                                           Telephone: (202) 326-7900
                                                           Email: sangstreich@kellogghansen.com
                                                                  tschultz@kellogghansen.com
                                                                  smartin@kellogghansen.com
                                                                  cmasterman@kellogghansen.com

*Attorneys for Defendants and Counterclaim Plaintiffs AT&T Corp., New Cingular Wireless Services, Inc., AT&T Mobility, LLC, New Cingular Wireless PCS, LLC, SBC Long Distance, LLC, and Teleport Communications Group, Inc.*