UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02206-RM-KLM

BRIGHTSPEED OF VIRGINIA, LLC,
CENTURYLINK OF FLORIDA, INC.,
BRIGHTSPEED OF WEST MISSOURI, INC.,
CENTURYLINK OF MINNESOTA, INC.,
BRIGHTSPEED OF KANSAS, INC.,
BRIGHTSPEED OF INDIANA, LLC,
BRIGHTSPEED OF OHIO, INC.,
UNITED TELEPHONE COMPANY OF THE NORTHWEST
d/b/a CenturyLink, and
QWEST CORPORATION d/b/a CenturyLink QC,

        Plaintiffs,

v.

AT&T CORP.,
NEW CINGULAR WIRELESS SERVICES, INC.,
AT&T MOBILITY, LLC,
NEW CINGULAR WIRELESS PCS, LLC,
SBC LONG DISTANCE, LLC, and
TELEPORT COMMUNICATIONS GROUP, INC.,

        Defendants.

---

**LUMEN PLAINTIFFS' OPPOSITION TO AT&T'S MOTION FOR
PRELIMINARY INJUNCTION [ECF 35]**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

I.      LUMEN PROVIDES TELECOMMUNICATION SERVICES TO AT&T AND
        OTHER COMPANIES IN THE INDUSTRY ..................................................... 3

II.     IN 2015, AT&T AND LUMEN EXECUTE THREE SEPARATE
        AGREEMENTS FOR SEPARATE SERVICES................................................. 4

III.    THE DISCOUNT AND BUY-SIDE AGREEMENTS EXPIRE ........................ 5

IV.     ONCE THE DISCOUNT AGREEMENT EXPIRED, AT&T BEGAN
        UNLAWFULLY WITHHOLDING PAYMENT FOR TDM SERVICES ........ 6

V.      LUMEN SENDS AT&T A NOTICE OF PAST-DUE BALANCE.................... 6

VI.     AT&T FILES ITS MOTION FOR PRELIMINARY INJUNCTION WEEKS
        AFTER LUMEN SENDS ITS NOTICE OF PAST-DUE BALANCE ............. 7

ARGUMENT.............................................................................................................. 8

I.      AT&T SEEKS A DISFAVORED MANDATORY INJUNCTION ................... 8

II.     AT&T WILL NOT PREVAIL ON THE MERITS ........................................... 9

        A.      Lumen's Damages Claim Does Not Preclude Lumen From Terminating
                AT&T's Services ................................................................................. 9

        B.      AT&T is Highly Unlikely to Prevail on the Merits of the Billing Dispute .......... 11

                1.      AT&T Cannot Show that an Extension of a Separate Contract
                        Regarding Separate Services Extended the Discount Agreement ............ 11

                        a.      The Plain Language of the Discount Agreement Refutes
                                AT&T's Extension Theory ........................................... 12

                        b.      The Parties' Course of Dealing Confirms the Discount
                                Agreement Expired on March 31, 2022........................ 14

                2.      AT&T Failed to Request a Term Discount Plan Under Section 4.3......... 15

              a.       AT&T Incorrectly Interprets Section 4.3 ...................................... 16

              b.       AT&T is Receiving Comparable Rates to Those It Provides to Lumen ....................................................................................... 17

III.     ANY HARM THAT AT&T WOULD SUFFER IS SELF-INFLICTED ........................ 19

IV.     THE PUBLIC INTEREST WILL NOT BE HARMED .................................................. 21

V.       THE BALANCE OF EQUITIES FAVORS LUMEN ...................................................... 22

VI.     IF THE COURT GRANTS AN INJUNCTION, AT&T SHOULD BE REQUIRED TO PAY A SIGNIFICANT BOND ............................................................. 23

CONCLUSION ........................................................................................................................ 24

**TABLE OF AUTHORITIES**

## CASES

*131 Heartland Blvd. Corp. v. C.J. Jon Corp.*,
  82 A.D.3d 1188 (N.Y. App. Div. 2011) ................................................................. 14

*Apex Pool Equip. Corp. v. Lee*,
  419 F.2d 556 (2d Cir. 1969) ................................................................................. 11

*AT&T Corp. et al., v. Cent. Tel. Co. of Va., et al.*,
  No. 3:22-cv-05172 (W.D. La. Aug. 31, 2022) ................................................. 13, 14

*Attorney Gen. of Okla. v. Tyson Foods Inc.*,
  565 F.3d 769 (10th Cir. 2009) ............................................................................... 9

*Bellin v. La Pensee Condo. Ass'n, Inc.*,
  No. 05-80071-CIV-MARRA/SELTZER, 2005 WL 8156021
  (S.D. Fla. Oct. 13, 2005) ..................................................................................... 19

*Canada Geese Protection Colo., LLC v. Lowney*,
  470 F. Supp. 3d 1220 (D. Colo. 2020) ................................................................. 19

*Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*,
  No. 20-cv-5240(LJL), 2020 WL 5894079
  (S.D.N.Y. Oct. 5, 2020) ....................................................................................... 21

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*
  356 F.3d 1256 (10th Cir. 2004) ..................................................................... 20, 23

*Ellington v. EMI Music, Inc.*,
  21 N.E.3d 1000 (N.Y. 2014) ................................................................................. 17

*ESPN, Inc. v. Office of Com'r of Baseball*,
  76 F. Supp. 2d 383 (S.D.N.Y. 1999) ................................................................... 11

*Gen. Motors Corp. v. Urban Gorilla, LLC*,
  500 F.3d 1222 (10th Cir. 2007) ......................................................................... 8, 9

*GTE Corp. v. Williams*,
  731 F.2d 676 (10th Cir. 1984) ............................................................................... 8

*Guzman v. N.M. State Dep't of Cultural Affairs*,
  534 F. Supp. 3d 1375 (D.N.M. 2021) ................................................................... 23

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ......................................................... 8, 20

*Martinez v. Cuomo*,
  459 F. Supp.3d 517 (S.D.N.Y. 2020) ...................................................... 23

*Munaf v. Green*,
  553 U.S. 674 (2008) ................................................................................ 3

*New York State Telecommunications Ass'n v. James*,
  544 F. Supp. 3d 269 (E.D.N.Y. 2021) ..................................................... 22

*Omega World Travel, Inc. v. Trans World Airlines*,
  111 F.3d 14 (4th Cir. 1997) ..................................................................... 9

*Phlo Corp. v. Stevens*,
  No. 00 Civ. 3619(DC), 2001 WL 630491
  (S.D.N.Y. June 7, 2001) .......................................................................... 10

*Predator Int'l v. Gamo Outdoor USA, Inc.*,
  669 F. Supp. 2d 1235 (D. Colo. 2009) ...................................................... 8

*Reuters Ltd. v. UPI, Inc.*,
  903 F.2d 904 (2d Cir. 1990) .................................................................... 20

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ................................................................ 8

*Safari Club Int'l. v. Salazar*,
  852 F. Supp. 2d 102 (D.D.C. 2012) ......................................................... 19

*Salt Lake Tribune Publ'g Co. v. AT&T Corp.*,
  320 F.3d 1081 (10th Cir. 2003) ........................................................... 2, 19

*Sun Chem. Corp. v. Dainippon Ink & Chem., Inc.*,
  635 F. Supp. 1417 (S.D.N.Y. 1986) ......................................................... 20

*This is Me, Inc. v. Taylor*,
  157 F.3d 139 (2d Cir. 1998) .................................................................... 13

*Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop.*,
  No. 5:15-CV-45-TBR, 2015 WL 1280818
  (W.D. Ky. Mar. 20, 2015) ............................................................... 2, 10, 20

*Trial Lawyers Coll. v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*,
  23 F.4th 1262 (10th Cir. 2022) ................................................................. 8

*Two Farms, Inc. v. Greenwich Ins. Co.*,
   993 F. Supp. 2d 353 (S.D.N.Y. 2014) .................................................................................. 17

*Universal Engraving, Inc. v. Duarte*,
   519 F. Supp. 2d 1140 (D. Kan. 2007) ................................................................................. 23

*Williams v. Mobil Oil Corp.*,
   83 A.D.2d 434 (N.Y. App. Div. 1981) ................................................................................. 13

**RULES**

Fed. R. Civ. P. 65 ........................................................................................................................ 23

Defendants AT&T Corp., et al. (together "AT&T") fail to establish that this case warrants the "extraordinary" remedy of preliminary injunctive relief. Accordingly, Plaintiffs CenturyLink of Florida, Inc.; CenturyLink of Minnesota, Inc.; United Telephone Company of the Northwest; and Qwest Corporation (together "Lumen")[1] ask the Court to deny AT&T's motion.

## INTRODUCTION

This is a straightforward billing dispute. For months, AT&T has refused to pay Lumen the contractually required rates for Lumen's telecommunication services. Lumen did what any service provider does when a customer stops paying its bills: it asked AT&T to pay its balance and informed AT&T that it would disconnect certain of AT&T's services if AT&T refused to pay. Rather than simply pay its past-due balance for those services, AT&T seeks a mandatory injunction that would force Lumen to continue providing AT&T services for tens of millions of dollars per month less than what AT&T owes. AT&T does not come close to establishing the requirements for a preliminary injunction.

At the outset, AT&T is highly unlikely to succeed on the merits. AT&T first argues that Lumen has elected a damages remedy and thus, it cannot now seek to disconnect. AT&T is wrong, and the case law it relies on does not apply where, like here, the plaintiff promptly notifies the defendant of the breach, and the defendant continues to breach the agreement. Moreover, Lumen will be entitled to continuing damages and a live dispute will exist between the parties, even if AT&T pays its past-due balance for the services at issue.

---

[1] On October 3, 2022, Lumen Technologies, Inc. sold some of the plaintiff-entities in this case to Connect Holding LLC d/b/a Brightspeed ("Brightspeed"). However, the Brightspeed plaintiffs are not impacted by AT&T's motion as Lumen limited its October 6, 2022 notice of past-due balance to services provided solely by Lumen-owned entities.

In addition, AT&T's assertion that it is entitled to discounted rates under the parties' expired contract is wrong. That agreement stated it "will not extend beyond March 31, 2022," and AT&T has admitted the agreement expired consistent with its express language. Further, the agreement makes clear that AT&T was required to provide Lumen with 90 days' notice if AT&T wanted a post-expiration "term discount plan" at rates consistent with those AT&T charges Lumen for similar services. AT&T failed to provide the required notice and allowed the agreement to expire.

AT&T also fails to establish the remaining factors. AT&T primarily argues that, absent a preliminary injunction, it will lose business and government entities and emergency service providers will lose service. (Mot. 9, 15-16, ECF No. 35.) But AT&T can easily avoid *all* of this harm by simply "pay[ing] the overdue bill and convert[ing] any potential harm to monetary damages." *Time Warner Cable Midwest LLC v. Pennyrile Rural Elec. Coop.*, No. 5:15-CV-45-TBR, 2015 WL 1280818, at *4 (W.D. Ky. Mar. 20, 2015) (denying a motion to enjoin the disconnection of telecommunication services). AT&T cannot rely on purely self-inflicted harm to obtain a preliminary injunction. *See Salt Lake Tribune Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable.").

Moreover, Lumen narrowly tailored its notice of past-due balance to avoid any threat to public health or safety by agreeing not to disconnect thousands of circuits for customers designated by the Federal Communications Commission ("FCC") as having national security and emergency preparedness missions. And in any event, any impacted customers could switch to one of many alternative providers. Thus, AT&T is wrong that "[m]ore than 1,400 AT&T wireline customers in 19 states would lose service." (Mot. 15.)

The Court should see AT&T's request for what it is—permission to underpay Lumen by millions of dollars per month while forcing Lumen to remain its service provider. This is not one of the rare circumstances warranting such an "extraordinary and drastic remedy." *Munaf v. Green*, 553 U.S. 674, 689 (2008).

## BACKGROUND

### I.  LUMEN PROVIDES TELECOMMUNICATION SERVICES TO AT&T AND OTHER COMPANIES IN THE INDUSTRY

Lumen and AT&T conduct business in the telecommunications industry. (Decl. of D. Widdoes ¶ 3, Ex. A.) As part of its business, Lumen sells Time Division Multiplexing ("TDM") services to other telecommunication companies such as AT&T. (*Id.* ¶ 4.) TDM services are used to provide certain voice, data, and video services to business customers over a physical copper-wire network. (*Id.*) Lumen owns and operates the legacy copper-wire network in certain areas of the country, while other companies, including AT&T, own and operate the legacy copper-wire network in other regions. (*Id.*) In the regions where Lumen maintains the physical network, AT&T purchases TDM services from Lumen to access Lumen's physical network to service its end-user customers. (*Id.*) Conversely, Lumen purchases TDM services from AT&T to access AT&T's physical network to service Lumen's end-user customers in the regions where AT&T maintains its network. (*Id.*) TDM services are provided to end-user customers over "circuits," including Digital Signal 1 ("DS1") and Digital Signal 3 ("DS3") circuits. (*Id.* ¶ 5.)

Lumen lists the rates it charges for TDM services in its publicly available Interstate Service Guides ("ISG"). (*Id.* ¶ 6.) However, Lumen can contractually agree to provide a specific customer with discounted rates—typically when the customer agrees to purchase Lumen's services for a defined term, rather than on a month-to-month basis. (*Id.* ¶ 7.) For instance,

Lumen's ISG No. 11 offers a one-year term plan that provides customers a 17% discount off of Lumen's monthly ISG rates in Lumen's former Qwest territory. (*Id.* ¶ 6; ISG No. 11 § 7.11.4.)[2] Absent a discount contract with a specific customer or a term plan, Lumen charges its customers the month-to-month rates set forth in the applicable ISGs. (Decl. of D. Widdoes ¶ 8.)

## II.   IN 2015, AT&T AND LUMEN EXECUTE THREE SEPARATE AGREEMENTS FOR SEPARATE SERVICES

In October 2015, Lumen and AT&T executed the Service Revenue Discount Plan Agreement ("Discount Agreement"), which provided AT&T with discount credits off of Lumen's ISG rates for TDM services. (Discount Agreement § 7.1, Ex. B.) Pursuant to the Discount Agreement, Lumen also did not raise AT&T's rates while the Discount Agreement was in effect. (*See id.* § 9.) The Discount Agreement had an initial three-year term, which would "automatically renew four times for a period of one year each unless [AT&T] provide[d] [Lumen] with thirty (30) days written notice before the next renewal period." (*Id.* § 4.1.) But the parties specified that the Discount Agreement "will not extend beyond March 31, 2022." (*Id.*)

In November 2015, Lumen and AT&T executed the ILEC Interstate Broadband Credit Agreement ("Buy-Side Agreement"). Like the Discount Agreement, the Buy-Side Agreement governed TDM services. (Decl. of R. Montenegro ¶ 3, Ex. C.) But it provided discounts to Lumen when Lumen purchased TDM services from AT&T. (*Id.*) The Buy-Side Agreement's initial term automatically extended four times through March 31, 2022. (*Id.* ¶ 3.)

---

[2] Lumen's ISG No. 11 is available at http://www.centurylink.com/tariffs/fcc_cloc_acc_isg_no_11_part1.pdf. While Lumen's ISG term discount plan is available to any purchaser in the marketplace, Lumen also may individually negotiate and agree to different discount arrangements with particular customers, as it did in the Discount Agreement.

Finally, in April 2015, Lumen and AT&T executed the Ethernet to the Cell Services Agreement ("Ethernet Agreement"), which amended three preexisting contracts between the parties. (Decl. of D. Widdoes ¶¶ 22-23.) Unlike the Discount and Buy-Side Agreements, the Ethernet Agreement does ***not*** involve TDM services. The Ethernet Agreement governs entirely unrelated services—AT&T's use of Lumen's network to transmit data between AT&T's wireless and core networks. (*Id.* ¶ 24.) The Ethernet Agreement had an initial seven-year term, but in March 2020, the parties extended the Ethernet Agreement's term through March 2024. (*Id.* ¶¶ 25-26.) This amendment does ***not*** refer to the Discount or Buy-Side Agreements. (*Id.* ¶ 26.)

## III.   THE DISCOUNT AND BUY-SIDE AGREEMENTS EXPIRE

After AT&T and Lumen extended the Ethernet Agreement, AT&T attempted to negotiate an extension of the Discount Agreement. (Decl. of D. Widdoes ¶ 10; Feb. 25, 2021 Proposal, Ex. 1 to Widdoes Decl; Apr. 29, 2022 Letter, Ex. 3 to Widdoes Decl. (AT&T's admission that it "communicated with Lumen about . . . an extension of the SRDP Agreement" on February 25, 2021.)) Then, in February or March 2022, Parley Casto, and Assistant Vice President for AT&T, again attempted to discuss an extension of the Discount Agreement with Lumen. (Decl. of D. Widdoes ¶ 10.) But the parties never reached an agreement (*id.*), and the Discount Agreement expired pursuant to its express terms on March 31, 2022. (*See* Discount Agreement § 4.1.)

Lumen and AT&T also did not extend the Buy-Side Agreement, and that agreement likewise expired on March 31, 2022. (Decl. of R. Montenegro ¶ 5; Apr. 20, 2022 Email, Ex. 1 to Montenegro Decl.; Apr. 28, 2022 Email Chain, Ex. 2 to Montenegro Decl.) Once the Buy-Side Agreement expired on March 31, 2022, AT&T stopped providing Lumen with discount credits under the Buy-Side Agreement. (Decl. of R. Montenegro ¶ 8.)

## IV.   ONCE THE DISCOUNT AGREEMENT EXPIRED, AT&T BEGAN UNLAWFULLY WITHHOLDING PAYMENT FOR TDM SERVICES

AT&T has not enrolled in a term discount plan for TDM services. (Decl. of D. Widdoes ¶ 11.) Accordingly, once the Discount Agreement expired, Lumen began invoicing AT&T based on the applicable month-to-month ISG rates. (*Id.*) During the term of the Discount Agreement, and in accordance with the terms set forth therein, Lumen did not raise AT&T's rates, and it granted AT&T significant discount credits. (*Id.*) These two benefits are not available under the ISGs, so the amount AT&T is currently required to pay has increased significantly following the Discount Agreement's expiration. (*Id.*)

From April through September 2022, AT&T paid Lumen the portion of that increase related to the eliminated discount credits it had been receiving. (*Id.* ¶ 13.) In other words, AT&T recognized and did not challenge that the Discount Agreement's credits were no longer available after its expiration on March 31, 2022.[3] (*See id.*) Nevertheless, since April 1, 2022, AT&T has inexplicably refused to pay Lumen's 2022 ISG rates and the resulting rate increase due to ISG rate changes since 2015, which amounts to over a hundred million dollars over the last six months alone, since these rates have increased since 2015. (*Id.* ¶ 14.)

Lumen filed this lawsuit to collect the amounts AT&T has unjustifiably withheld from Lumen since April 1, 2022, and continues to withhold from Plaintiffs each month. (Compl. ¶ 1.)

## V.   LUMEN SENDS AT&T A NOTICE OF PAST-DUE BALANCE

Because AT&T continues to breach the ISGs, and to curb its mounting losses, Lumen sent AT&T a notice of past-due balance on October 6, 2022. (Notice of Past-Due Balance, Ex. 5

---

[3] In October 2022, AT&T retroactively clawed back the millions of dollars it had paid due to the expired discounts. (*Id.* ¶ 13.)

to Widdoes Decl.) Lumen limited the notice to only a portion of the circuits for which AT&T has withheld payment. (*Id.*) Specifically, Lumen excluded all circuits "identified by AT&T and coded by Lumen" as receiving priority treatment for their national security or emergency preparedness missions ("TSP" circuits). (*Id.*) Lumen also excluded circuits now owned by a separate entity, Brightspeed, to whom Lumen recently sold some of the plaintiff-entities.[4] (*Id.*)

The notice informed AT&T that the past-due balance on the circuits subject to the notice was over $138 million. (Notice of Past-Due Balance.) The notice and accompanying email further stated that if AT&T refused to pay its balance within 60 days, Lumen "will begin the disconnection process" for the identified circuits. (*Id.*) But Lumen assured AT&T that it would not "disconnect circuits shown by AT&T to present a threat to public health or safety." (*Id.*)

On October 21, AT&T informed Lumen that it believes "Lumen's [disconnection] list contains more than 1,281 TSP circuits." (Oct. 21 Letter, Ex. 6 to Widdoes Decl.) Even though Lumen's records did not reflect that all of these circuits have a TSP designation, Lumen agreed not to disconnect them out of an abundance of caution. (Nov. 1 Letter, Ex. 7 to Widdoes Decl.)

## VI.   AT&T FILES ITS MOTION FOR PRELIMINARY INJUNCTION WEEKS AFTER LUMEN SENDS ITS NOTICE OF PAST-DUE BALANCE

On October 19, more than *seven weeks* after Lumen filed its lawsuit and nearly *two weeks* after Lumen sent the notice of past-due balance, AT&T filed the present motion for preliminary injunction. (ECF No. 35.) Despite its delays in seeking this relief, AT&T asks the Court to promptly enjoin Lumen from disconnecting the services. (*Id.* at 2.) In other words,

---

[4] The Brightspeed transaction was structured as a sale of ownership interests in multiple entities, rather than a sale of assets and liabilities. Thus, the legal entities providing the services remain the same, but the parent company who owns the entity has changed.

AT&T asks this Court to force Lumen to continue providing AT&T with services, notwithstanding AT&T's refusal to pay millions of dollars per month in incurred charges.

## ARGUMENT

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is 'clear and unequivocal.' *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). Preliminary injunctions are "the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

To obtain a preliminary injunction, AT&T must show: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *Predator Int'l v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1242 (D. Colo. 2009) ("[T]he moving party bears the burden of establishing that four factors weigh in its favor.").

Because AT&T seeks a mandatory injunction forcing Lumen to provide services, AT&T has a heightened burden on each of these factors. *See Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). AT&T fails to meet its burden on every factor.

## I.    AT&T SEEKS A DISFAVORED MANDATORY INJUNCTION

"[I]njunctions are considered 'mandatory' when they 'affirmatively require' action." *Trial Lawyers Coll. v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1275 (10th Cir. 2022). Here, through its standard process for addressing unpaid invoices, Lumen issued a notice of past-due balance informing AT&T certain services will be disconnected unless AT&T pays its past due amounts. AT&T asks the Court to override this standard process and

force Lumen to continue providing AT&T with TDM services for the duration of this dispute. Courts have classified similar requests for injunctive relief as "mandatory injunctions." *See, e.g.*, *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 15 n.1 (4th Cir. 1997) ("[T]he injunction is best characterized as mandatory because it orders the parties to continue in a relationship that would otherwise, under the contract, be terminable at will.").

Because AT&T seeks a disfavored, mandatory injunction, AT&T must meet "a ***heightened burden*** and must make a ***strong showing*** both with regard to the likelihood of success on the merits and with regard to the balance of harms.'" *Gen. Motors Corp.*, 500 F.3d at 1226 (emphasis added) (citations omitted); *Attorney Gen. of Okla. v. Tyson Foods Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) ("[M]andatory preliminary injunctions are disfavored."). AT&T fails to meet its heightened burden here.[5]

## II.      AT&T WILL NOT PREVAIL ON THE MERITS

AT&T asserts two merits arguments: (1) that Lumen seeks to improperly "moot its damages action," and (2) that AT&T is likely to succeed on the merits of the underlying billing dispute. (Mot. 11-15.) AT&T is not likely to succeed on either argument.

### A.      Lumen's Damages Claim Does Not Preclude Lumen From Terminating AT&T's Services

AT&T argues that Lumen improperly seeks to grant itself "the ultimate relief it seeks and moot the damages claim Lumen filed." (*Id.* at 11.) According to AT&T, Lumen cannot do this because Lumen already elected to continue providing services to AT&T. (*Id.* at 11-12.)

AT&T's argument is factually and legally wrong. AT&T is withholding over $8.5 million

---

[5] AT&T fails to meet its burden, even if the Court does not apply the heightened standard for mandatory injunctions.

per month for circuits **not** subject to the notice of past-due balance, so Lumen will have a significant damages claim regardless of whether AT&T pays the amount requested in the notice. (Decl. of T. Swindall ¶ 9, Ex. D.) Moreover, even if AT&T pays the amount it owes to avoid a disconnect, the parties will still have a live dispute regarding whether AT&T actually owed that amount. AT&T's counterclaim(s) in fact seek exactly that relief. Thus, Lumen's notice of past-due balance does not moot any of the issues in this case.

Further, AT&T cites no legal authority—because there is none—suggesting that Lumen must continue to accept AT&T's materially deficient performance merely because a lawsuit is pending. In fact, courts have reached the opposite conclusion in denying motions for preliminary injunction. In *Time Warner Cable Midwest, LLC*, the court rejected the movant's argument that a service provider improperly resorted to "self-help" by seeking to disconnect telecommunication services while an administrative proceeding was pending. 2015 WL 1280818, at *4.

The only cases AT&T cites involve the election of remedies doctrine, which does not apply here. Under that rule, a party cannot disregard a prior breach by choosing to continue accepting the other party's performance and then later decide to terminate the contract based solely on **the prior breach**. *See Phlo Corp. v. Stevens*, No. 00 Civ. 3619(DC), 2001 WL 630491, at *4 (S.D.N.Y. June 7, 2001). Here, Lumen never chose to accept AT&T's deficient performance. On the contrary, Lumen promptly notified AT&T of its breaches and filed this lawsuit. (May 10 Letter, Ex. 4 to Widdoes Decl.; Compl.)

Moreover, Lumen does not seek to disconnect based only on a prior breach. Lumen seeks to disconnect because AT&T **continues** to breach the ISGs by withholding millions of dollars every month. (Decl. of Doug Widdoes ¶ 17.) The "election of remedies" doctrine does not apply

when, like here, "the other party subsequently commits another material breach." *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999); *see also Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969) ("[D]eciding to continue a contract despite a breach does not necessarily foreclose future terminations if there are succeeding breaches.").

AT&T has put forth no facts or legal authority supporting its argument that Lumen's decision to file a lawsuit seeking damages somehow forces it to provide services to AT&T for a period of years at rates far less than AT&T owes. The Court should reject AT&T's argument.

**B.      AT&T is Highly Unlikely to Prevail on the Merits of the Billing Dispute**

AT&T asserts two arguments to justify withholding millions of dollars per month from Lumen: (1) the Discount Agreement has not expired, and (2) AT&T is entitled to rates consistent with those AT&T charges Lumen for similar services. (Mot. 12-15.) Both arguments lack merit.

**1.      AT&T Cannot Show that an Extension of a Separate Contract Regarding Separate Services Extended the Discount Agreement**

The Discount Agreement plainly states it "will not extend beyond March 31, 2022." (Discount Agreement § 4.1.) AT&T claims this Agreement did not expire consistent with its express language because an extension of the Ethernet Agreement automatically extended the Discount Agreement. (Mot. 12-13.) According to AT&T, the Court should treat the multiple agreements as a single agreement because the Discount Agreement refers to the Ethernet and Buy-Side Agreements as "Concurrent Agreements" and states they "run concurrently," and the agreements serve a common purpose. (*Id.*)

AT&T's argument directly contradicts (1) the plain language of the Discount Agreement, and (2) the parties' course of dealing.

> a. *The Plain Language of the Discount Agreement Refutes AT&T's Extension Theory*

The Discount Agreement states that "it is the intent of the Parties to **execute** the Concurrent Agreements contemporaneously" and that none of the agreements "will become enforceable, until and unless all Concurrent Agreements are fully **executed**." (Discount Agreement § 1 (emphasis added).) But nothing in the Discount Agreement states that the agreements must **expire** together. To the contrary, the agreement's plain language shows that the parties did **not** intend the three "Concurrent Agreements" to be treated as a single contract with the same expiration date.

At the outset, the Discount and Ethernet Agreements have different terms that allow the Discount Agreement to terminate **before** the Ethernet Agreement. The Discount Agreement has an initial three-year term that automatically renews each year until March 31, 2022 unless AT&T terminates the agreement early by "provid[ing] [Lumen] with thirty (30) days written notice before the next renewal period." (Discount Agreement § 4.1.) The Ethernet Agreement, in contrast, has a fixed seven-year term. (Decl. of D. Widdoes ¶ 25.)

The Discount Agreement also expressly contemplates that the "Concurrent Agreements" may terminate on different dates. Sections 4.2.1 and 4.2.2 state that if AT&T terminates the Buy-Side Agreement or if that agreement fails to take effect due to FCC action, the parties will attempt to negotiate an alternative agreement that provides Lumen with similar credits as the Discount Agreement. (Discount Agreement §§ 4.2.1, 4.2.2.) If the parties are unable to do so within 30 days, Lumen can terminate the Discount Agreement. (*Id.* at § 4.2.2.) This provision does not even mention the Ethernet Agreement, let alone state that terminating the Buy-Side or

Discount Agreements automatically terminates the Ethernet Agreement.

Similarly, Section 4.5 of the Discount Agreement states that if AT&T terminates one of the other agreements "*for any reason other than for Cause*, . . . then this Agreement will be terminated (if not already terminated)." (*Id.* § 4.5 (emphasis added).) This provision necessarily implies that if AT&T terminates one of the other agreements *for cause*, the Discount Agreement would ***not*** automatically terminate.

Notwithstanding the Discount Agreement's plain language, AT&T argues the agreements should be treated as one in the same because the contracts relate to the same subject matter and have the same purpose. (Mot. 12-13.) AT&T is mistaken. The Discount Agreement governed AT&T's purchase of TDM services from Lumen and provided AT&T with discount credits off of Lumen's month-to-month rates. (Decl. of D. Widdoes ¶ 9; Discount Agreement §§ 1, 7.) The Ethernet Agreement, in contrast, contains detailed specifications for entirely separate, unrelated services—AT&T's use of Lumen's network to transmit data between AT&T's wireless and core networks.[6] (Decl. of Doug Widdoes ¶ 24.)

AT&T's own allegations prove these contracts are different. (*See* Countercls. ¶ 2 (alleging the Discount Agreement "provides discounted rates to AT&T when it buys from Lumen dedicated access services"); Compl.¶ 3, *AT&T Corp. et al.*, *v. Cent. Tel. Co. of Va., et al.*, No. 3:22-cv-05172 (W.D. La. Aug. 31, 2022) (alleging the Ethernet Agreement contained

---

[6] These agreements are wholly distinguishable from those in the cases AT&T cites. In *Williams v. Mobil Oil Corp.*, the parties entered into two contracts that related to "the supply of gasoline by Mobil to Pace." 83 A.D.2d 434, 440 (N.Y. App. Div. 1981). In *This is Me, Inc. v. Taylor*, the court found that various agreements all relating to an actor's role in a single Broadway production could be considered together. 157 F.3d 139, 145 (2d Cir. 1998).

technical specifications governing Lumen's transmission of data between AT&T's wireless and core networks). In fact, after Lumen filed this case, AT&T filed a **separate** lawsuit in a **separate** court regarding the Ethernet Agreement. (Compl., *AT&T Corp. et al.*, No. 3:22-cv-05172.) AT&T's complaint in that lawsuit does not even mention the Discount Agreement. (*Id.*)

Because the contracts have different terms and involve different subjects, AT&T cannot show that extending the Ethernet Agreement automatically extended the Discount Agreement. *See 131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1190 (N.Y. App. Div. 2011) ("Contracts remain separate unless their history and subject matter show them to be unified.").

> b. *The Parties' Course of Dealing Confirms the Discount Agreement Expired on March 31, 2022*

Not only is AT&T's interpretation inconsistent with the Discount Agreement's language, it also contradicts the parties' course of dealing and AT&T's own statements. In February 2021, after the parties had extended the Ethernet Agreement, AT&T tried to negotiate an extension of the Discount Agreement. (Decl. of D. Widdoes ¶ 10.) AT&T emailed Lumen a spreadsheet titled "Lumen Term Sheet," which stated, "AT&T Proposal 02/25/2021 . . . Extend expiring SRDP agreement." (Feb. 25, 2021 Proposal, Ex. 1 to Widdoes Decl.) Shortly before the Discount Agreement expired, AT&T **again** attempted to discuss an extension of the Discount Agreement. (Decl. of D. Widdoes ¶ 10.) If AT&T truly believed the Ethernet Agreement's extension automatically extended the Discount Agreement, there would have been no reason for it to try to separately extend the Discount Agreement twice.[7]

AT&T also admitted the Discount Agreement expired after March 31, 2022. On April 11,

---

[7] Moreover, the 110-page amendment of the Ethernet Agreement that AT&T claims extended the Discount Agreement does not even mention the Discount Agreement. (*Id.* ¶ 26.)

Lumen provided AT&T with its "last" report regarding the Discount Agreement and noted that "the discount plan expired on 3/31/2022." (Apr. 11, 2022 Email, Ex. 2 to Widdoes Decl.) A week later, an AT&T Carrier Relations Manager responded by asking for Lumen's help to "close out" the "final validation" for the Discount Agreement. (*Id.*) Still further, after March 31, 2022, AT&T began paying Lumen the amount of the discount credits it had previously been receiving under the Discount Agreement, thus acknowledging the discount credits—and the Discount Agreement itself—had expired.[8] (Decl. of D. Widdoes ¶ 13.)

AT&T has also acknowledged that the other "Concurrent Agreement"—the Buy-Side Agreement—likewise expired on March 31, 2022. (Decl. of R. Montenegro ¶¶ 6-7; Apr. 28, 2022 Email, Ex. 2 to Montenegro Decl.) In fact, AT&T admits that it stopped performing—i.e., providing Lumen discounts for TDM services—under the Buy-Side Agreement as of the March 31, 2022 expiration date. (Countercls. ¶ 33.) AT&T's treatment of the Buy-Side Agreement as expired as of March 31, 2022 cannot be reconciled with its contention that the Ethernet Agreement automatically extended both the Discount and Buy-Side Agreements.

Both parties clearly understood the Discount Agreement expired when it said it did—on March 31, 2022. AT&T will not be able to prove otherwise.

### 2.      AT&T Failed to Request a Term Discount Plan Under Section 4.3

AT&T next argues that even if the Discount Agreement expired, it is entitled to rates that are consistent with what AT&T charges Lumen for similar services. (Mot. 13-15.) To support

---

[8] AT&T nevertheless withheld the tens of millions of dollars per month that were attributable to rate increases under the ISGs. And in October 2022, realizing the inconsistency between its business conduct and litigation position, AT&T retroactively clawed back the millions of dollars it had paid due to the expired discounts. (*Id.* ¶¶ 13-14.)

this argument, AT&T interprets Section 4.3 of the Discount Agreement as containing two separate post-termination provisions—one that allows AT&T to enroll in a term plan with at least 90 days' written notice before expiration of that agreement, and a second that allows AT&T to obtain services at rates consistent to those AT&T charges Lumen for similar services. (Mot. 13-15.) AT&T's argument fails for two reasons: (1) AT&T incorrectly interprets Section 4.3, and (2) in any event, AT&T is already obtaining rates lower than those it charges Lumen.

<em>a.      AT&T Incorrectly Interprets Section 4.3</em>

Contrary to AT&T's argument, Section 4.3 refers to a ***single*** contractual obligation, conditioned on timely notice:

> At the end of the Term if the Parties have not entered into an amendment extending the Term, Customer may enroll any existing Qualifying Services that are billed at month to month rates in a term discount plan. ***Customer must provide written notice to CenturyLink of its intent to enroll in*** <ins>***such term plan***</ins> ***at least 90 days in advance of the end of Term.*** The Parties agree that Customer is entitled to purchase its Qualifying Services that are in-service at the end of the Term of this Agreement, at rates, terms and conditions consistent with those rates, terms and conditions offered to CenturyLink for similar services from Customer's Affiliates. <ins>***In order for Customer to do so, at Customer's request***</ins>***, CenturyLink will convert Qualifying Services to*** <ins>***the elected term discount plan***</ins>***, in addition to executing any other requisite document necessary to effectuate the Parties agreement.***

(Discount Agreement § 4.3 (emphasis added).)

The first two sentences allow AT&T to obtain a term discount plan for "Qualifying Services" if AT&T provides 90 days' notice before the expiration of the agreement. The third sentence mandates that Lumen provide rates in that term discount plan that are consistent with the rates AT&T charges Lumen for similar services. And the final sentence confirms that each of the four sentences in this paragraph refer to a single right by stating that, "in order for [AT&T] to do so"—i.e., purchase qualifying services "at rates, terms and conditions consistent with those"

16

that AT&T offers to Lumen—Lumen must convert qualifying services to "the elected term plan" requested by AT&T through timely notice. Any other reading would contradict the well-established principles that courts must "read[] the contract as a whole," *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014), and "give each word and phrase in a contract its plain meaning and avoid rendering the terms or provisions of a contract superfluous."[9] *Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 360 (S.D.N.Y. 2014).

AT&T contends it could not enroll in a term discount plan because Lumen eliminated all term plans offered under its ISGs in 2019. (*See* Mot. 14.) AT&T is mistaken. (*See* Decl. of D. Widdoes ¶ 6; (stating that Lumen offers a one-year term discount plan on the vast majority of the services subject to the disconnect).) Regardless, Section 4.3 does not require the "term discount plan" to be "existing" at the time AT&T enrolls. The remaining sentences of Section 4.3 confirm that, **with 90 days' notice**, AT&T could request a "term discount plan" "at rates, terms, and conditions consistent with those rates, terms and conditions offered to [Lumen] for similar services," regardless of whether Lumen had a pre-existing plan that fit that description.

AT&T does not dispute that it failed to provide the required 90 days' notice, so AT&T cannot show it is contractually entitled to a section 4.3 term discount plan.

> b.   *AT&T is Receiving Comparable Rates to Those It Provides to Lumen*

Even if AT&T correctly interpreted Section 4.3, AT&T is currently receiving rates that

---

[9] In addition, nothing in the Discount Agreement indicates that AT&T could request a term discount plan under Section 4.3 after the contract terminated. If the parties had intended to grant AT&T the right to request a term discount plan under Section 4.3 after the Discount Agreement expired without providing 90 days' notice, as AT&T mistakenly claims, they would have included language stating that Section 4.3 survives termination of the agreement.

are comparable to the rates AT&T charges for similar services. AT&T cherry-picks a "15-mile, high-capacity, DS3 circuit" and claims that the rates for its three-year term plan are less than the month-to-month rates Lumen charges for that same circuit. (Mot. 14-15.)

But AT&T's "comparison" does not represent the true nature of the parties' relationship.

Further, contrary to AT&T's assertion, Lumen's publicly available ISG offers a 17% twelve-month discount plan for the vast majority of the services Lumen seeks to disconnect. (Decl. of D. Widdoes ¶ 6.) AT&T simply has not requested it. Finally, AT&T recently eliminated its three-year term plans, meaning it no longer offers Lumen the "rates, terms and conditions" in those plans. (Decl. of R. Montenegro ¶ 20.) When using an apples-to-apples comparison that reflects the parties' business relationship, Lumen's rates are comparable to AT&T's rates.[10] (*Id.* ¶¶ 10-13; Decl. of T. Swindall ¶ 12.)

Moreover, even if it were true that AT&T is not presently receiving similar rates, it is *undisputed* that AT&T is withholding far more per month than the difference between what

---

[10] Lumen's rates are comparable to AT&T's rates even for the small portion of services for which AT&T cannot purchase a 12-month term plan. Term plans involve substantial risk because AT&T charges significant early-termination penalties that greatly increase the overall monthly cost of the services in the event Lumen has to cancel before the term expires. (Decl. of R. Montenegro ¶ 14.) Of course, these monthly rates are greater than the $12,000 Lumen month-to-month rate that AT&T cites in its motion. (Mot. 14.)

Lumen charges and what AT&T charges. Thus, Lumen will be entitled to substantial damages, even accepting AT&T's incorrect interpretation of Section 4.3 and its misunderstanding of the rate structure. "Because [AT&T] fails to show a likelihood of success on the merits, the Court need not examine the remaining three factors." *Canada Geese Protection Colo., LLC v. Lowney*, 470 F. Supp. 3d 1220, 1231 (D. Colo. 2020). The Court's analysis should end here.

## III.   ANY HARM THAT AT&T WOULD SUFFER IS SELF-INFLICTED

AT&T claims that disconnecting its services will "cost[] AT&T its reputation and goodwill, as well as future business opportunities in the wirelines and wireless marketplaces." (Mot. 10.) But this does ***not*** constitute "irreparable harm," for at least three reasons.

First, all of AT&T's alleged harm is self-inflicted. The only reason AT&T may possibly suffer harm is because it refuses to pay its bills. It is "well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Safari Club Int'l. v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012); *Salt Lake Tribune Publ'g Co.*, 320 F.3d at 1106 ("We will not consider a self-inflicted harm to be irreparable.").

Second, AT&T can avoid its alleged harm by simply paying its past-due balance.[11] AT&T acknowledges it has the resources to pay Lumen the amount it owes; it simply chooses not to do so. (*See* Mot. 17 ("If AT&T is required to pay amounts it has disputed and withheld, AT&T will be able to pay that judgment.").) AT&T "cannot refuse to [mitigate the alleged harm] and yet still claim that [it] would be irreparably injured absent an injunction." *Bellin v. La Pensee*

---

[11] This is precisely how the parties have dealt with issues like this in the past. As recently as May 2020, AT&T sent Lumen numerous disconnect notices claiming that Lumen had a past-due balance on its accounts and threatening disconnection. (AT&T Disconnect Notices, Ex. E.) Rather than seek a preliminary injunction to avoid paying its bills, Lumen reached a business resolution with AT&T that prevented the disconnect and any harm that would result from it.

*Condo. Ass'n, Inc.*, No. 05-80071-CIV-MARRA/SELTZER, 2005 WL 8156021, at *9 (S.D. Fla. Oct. 13, 2005) ("[I]t is well settled that avoidable harm is not irreparable harm."); *Sun Chem. Corp. v. Dainippon Ink & Chem., Inc.*, 635 F. Supp. 1417, 1422 (S.D.N.Y. 1986) (denying a preliminary injunction because the alleged harm was "avoidable").

Finally, by paying its overdue balance, AT&T can convert all of its alleged harm to non-irreparable, monetary damages. *Heideman*, 348 F.3d at 1189 ("It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm."). In fact, courts have denied motions for preliminary injunction for this very reason in nearly identical circumstances. In *Time Warner Cable Midwest LLC*, Time Warner rented utility poles from Pennyrile that allowed Time Warner to provide cable, Internet, and phone services to its customers. 2015 WL 1280818, at *1. For two years, Time Warner withheld portions of Pennyrile's invoiced amounts, claiming that they were greater than what other entities charged for similar services. *Id.* When Pennyrile sent a letter threatening to disconnect Time Warner's services if Time Warner did not pay, Time Warner moved for a preliminary injunction, arguing that it "will lose goodwill and customers if it is no longer able to provide telecommunications services." *Id.* at *4. The court rejected Time Warner's argument and denied its motion, holding that "***Time Warner may pay the overdue bill and convert any potential harm to monetary damages***." *Id.* (emphasis added). The Court should reach the same conclusion here.[12]

---

[12] Unlike *Time Warner*, the cases AT&T cites do not involve alleged harm to goodwill that the movant could avoid by paying the past-due amount and suing for damages. *See Reuters Ltd. v. UPI, Inc.*, 903 F.2d 904, 906 (2d Cir. 1990) (discussing a threat to terminate a contract because the moving party allegedly breached an "obligation to provide pictures of the same quality and volume as it had supplied" earlier); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (discussing breach of an exclusivity clause in the parties' contract and finding that "any damage caused by [the defendant's] breach of the

Because all of AT&T's harm is self-inflicted and could easily be converted to monetary damages, AT&T fails to show irreparable harm.[13]

## IV.   THE PUBLIC INTEREST WILL NOT BE HARMED

AT&T next argues that refusing to grant a preliminary injunction would harm the public interest by causing governments, state and local law enforcement, health care providers, and other businesses to lose phone service. (Mot. 15-16.) AT&T is mistaken about this too.

Again, AT&T can avoid any harm to the public by simply paying its bills. AT&T cannot create an alleged harm and then rely on that harm to obtain an injunction. *See generally Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*, No. 20-cv-5240(LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) ("[A] movant cannot manufacture its own exigency.").

Even so, Lumen's disconnection is narrowly tailored to avoid any threat to the public health or safety. Lumen has specifically excluded all circuits serving customers with a priority designation, which includes numerous government agencies, healthcare providers, and other essential service providers. (Notice of Past-Due Balance.) When AT&T identified an additional 1,200 circuits that AT&T believes have TSP designation, Lumen agreed not to disconnect those circuits too. (Nov. 1, 2022 Letter, Ex. 7 to Widdoes Decl.)

Moreover, any customers without the TSP designation can avoid interruption to their service by switching to alternative service providers. The FCC maintains a publicly accessible resource that lists the service providers available at any address. *See* Fixed Broadband

---

exclusivity agreement can be quantified in damages").

[13] AT&T is also wrong that it cannot switch to alternative providers or alternative services. And in any event, under no circumstances should AT&T receive an injunction during the entire pendency of this action. Any injunction should be limited to the time period needed for AT&T to transfer to alternative services.

Deployment, Federal Communications Commission, https://broadband477map.fcc.gov/#/ (last accessed Oct. 31, 2022.) As the Court can see for itself by searching the addresses of the AT&T customers listed in AT&T's declaration (*see* Decl. of P. Casto ¶¶ 8-11, ECF No. 37), these customers have alternative options. AT&T is incorrect that "more than 1,400 AT&T wireline customers in 19 states would lose services." (Mot. 15.)

AT&T cites *New York State Telecommunications Ass'n v. James*, 544 F. Supp. 3d 269 (E.D.N.Y. 2021) for the proposition that the public interest favors an injunction when the enjoined conduct reduces Internet access. (Mot. 16.) But *James* supports Lumen's opposition. In *James*, the movant sought to enjoin enforcement of the Affordable Broadband Act, which required Internet providers to offer low-income customers service at or below price ceilings. 544 F. Supp. 3d at 273. The court enjoined enforcement of the Act, as there was evidence that forcing providers to offer services at below-market rates would "reduce Internet access statewide." *Id.* at 287-89. Here, AT&T asks the Court to do exactly what the Court in *James* refused to do—force a provider to offer services at extremely discounted rates.

AT&T fails to show that its requested injunction is in the public interest.

## V.      THE BALANCE OF EQUITIES FAVORS LUMEN

AT&T is also wrong that the "balance of the equities" supports a preliminary injunction. AT&T admits that it has the resources to pay its past-due invoices and avoid all of its alleged harm. (Mot. 17.) In contrast, AT&T's blanket request to force Lumen to continue providing services to AT&T "during the pendency of this action" is unreasonable and would significantly harm Lumen. Even assuming this proceeding lasts for only two years until November 2024, AT&T will have incurred a past-due balance close to ***a billion dollars*** by that time for the

services at issue. (Decl. of T. Swindall ¶ 8.) Forcing Lumen to loan AT&T nearly a billion dollars while the parties resolve a dispute Lumen is likely to win would pose a significant financial burden and would harm Lumen's ability to invest in its business with the money AT&T should be paying.[14] The balance of the equities favors Lumen.

## VI.   IF THE COURT GRANTS AN INJUNCTION, AT&T SHOULD BE REQUIRED TO PAY A SIGNIFICANT BOND

"Rule 65(c) provides in part that no preliminary injunction shall issue 'except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined.'" *Dominion Video Satellite, Inc.*, 269 F.3d at 1158 (quoting Fed. R. Civ. P. 65(c)). Courts often issue bonds that approximate actual damages in the event the opposing party prevails. *See Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1156 (D. Kan. 2007) (requiring an employer to post "a bond sufficient enough to protect [the opposing party] against damages resulting from lost wages"); *Guzman v. N.M. State Dep't of Cultural Affairs*, 534 F. Supp. 3d 1375, 1386 (D.N.M. 2021) (requiring the moving party to post a bond equal to the amount to compensate the opposing party from delays associated with a construction project).

Here, if the Court issues a preliminary injunction, it would force Lumen to continue providing services to AT&T for approximately $20 million less per month than AT&T owes. (Decl. of T. Swindall ¶¶ 4, 9.) The amount AT&T owes for the circuits at issue in the last six

---

[14] AT&T's reliance on case law stating that an injunction would not "impose an undue financial or administrative burden" is misplaced. (Mot. 16-17 (quoting *Martinez v. Cuomo*, 459 F. Supp.3d 517, 526-27 (S.D.N.Y. 2020)).) In *Martinez*, the "financial burden" was providing a sign language interpreter in-frame at Governor Cuomo's press briefings. 459 F. Supp. at 526. Here, the financial burden is near a billion dollars in past-due invoices.

months alone totals over $100 million. (*Id.* ¶ 4.) If the Court allows AT&T to continue withholding approximately $20 million per month for the next two years (or longer) while this litigation is pending, AT&T's total past-due balance, including interest and fees, would approach *$1 billion*. (*Id.* ¶ 8.) To provide security for the significant amount of past-due fees that AT&T owes Lumen, this Court should require AT&T to post a bond of at least $500,000,000.[15]

Remarkably, AT&T claims, without any support, that the Court should not require it to post a bond because "AT&T will be able to pay [any] judgment" issued in this case. (Mot. 17.) Of course, Rule 65(c) exists so that Lumen does not have to take AT&T's word that it will readily be able to pay nearly a billion dollars in past-due charges when Lumen prevails. If the Court issues a preliminary injunction, the Court should require AT&T to post a bond in an amount sufficient to compensate Lumen for AT&T's wrongful withholding.

## CONCLUSION

AT&T does not come close to making a "clear and unequivocal" showing that it is entitled to preliminary injunctive relief. The Court should deny AT&T's motion.

---

[15] Lumen reserves the right to seek leave to move for a supplemental bond in the event this proceeding does not resolve within the next two years.

Dated:  November 3, 2022.

Respectfully submitted,

_s/ Kathryn A. Reilly_

Kathryn A. Reilly
Michael T. Williams
Michael R. Krantz
Jacob A. Rey
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:  reilly@wtotrial.com
         williams@wtotrial.com
         krantz@wtotrial.com
         rey@wtotrial.com

Attorneys for Plaintiffs

25

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on November 3, 2022, I electronically filed the foregoing **LUMEN PLAINTIFFS' OPPOSITION TO AT&T'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Paul R. Franke, III**
  paul.franke@moyewhite.com

- **Patrick J. Hickey**
  patrick.hickey@moyewhite.com

- **Scott H. Angstreich**
  sangstreich@kellogghansen.com

- **Clayton J. Masterman**
  cmasterman@kellogghansen.com

*s/ Claudia L. Jones*